ZETA ENTERPRISES, INC. y OTROS, demandantes y peticionarios, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO y OTROS, demandados y recurridos.

*Número:* CC-97-94          *Resuelto:* 5 de marzo de 1998

*Pedro E. Ortiz Álvarez*, abogado de la parte peticionaria; *Pedro J. Polanco* e *Ignacio J. Gorrín Maldonado*, de *Fiddler, González & Rodríguez*, abogados de la parte recurrida.

PER CURIAM:

## I

En 1992, el Departamento de la Vivienda (en adelente el Departamento), que estaba interesado en privatizar la administración y el mantenimiento de ciertos residenciales públicos, convocó a los interesados a participar en una subasta para la contratación de tal servicio. Para esos efectos publicó un documento titulado *Request for Proposal* (en adelante R.F.P.), que era una especie de borrador de los contratos que posteriormente se firmarían con los que obtuviesen la buena pro en la subasta. Este documento fue redactado en conjunto por funcionarios del Estado Libre Asociado (en adelante el E.L.A.) y del Departamento de Vivienda y Desarrollo Urbano del Gobierno federal (en adelante H.U.D.).

El 29 de mayo de dicho año se celebró una reunión entre los interesados en la subasta y los funcionarios del Departamento. Esta reunión se hizo para aclarar las dudas que con respecto al R.F.P. tuviesen los potenciales participantes en la subasta. Las interrogantes que allí surgieron fueron recogidas en un documento titulado *Preguntas y Respuestas*, mediante el cual se enmendó y clarificó al documento original.[1] Según el R.F.P., la duración del contrato sería de dos años, con dos opciones de extensión de dos años adicionales cada una. Tras sugerencias surgidas en esa reunión, por medio del nuevo documento, se exten-

---

[1] La pregunta Núm. 18 y su subsiguiente contestación lo aclaran de la manera siguiente:

"Will there be amendments to the RFP?

"Yes, the RFP is hereby amended or clarified by the responses to the questions contained herein and any other clarifications provided herein."

dió el término de los contratos en subasta a tres años, con una única opción de extensión de dos años adicionales.

La versión final del contrato, en lo pertinente a la controversia de autos, disponía lo siguiente:

Article F-1–Term of Contract, Option, and Commencement of Work

A.   This Contract shall become effective on the date of ITS approval by HUD and shall cover the period of August 1, 1992 to June 30, 1995. *There shall be one (1) additional twoyears option period. At the end of Fiscal year ending 1995, the Owner shall make an assessment to determine whether the contract should be extended for an additional two-year, option period. The Owner with HUD approval shall extend the term of the Contract for the additional two years option period unless a determination is made, with HUD approval, not to exercise the option to extend.*([2]) (Énfasis suplido.)

Los demandantes obtuvieron la buena pro en las subastas y los contratos fueron firmados, conteniendo el Art. F-1,

---

([2]) Las restantes disposiciones del contrato eran las siguientes:

"B.   The Owner shall give the Contractor a preliminary notice of its intent not to extend the Contract at least 90 days prior to the expiration of the initial term. *Failure by the Owner to make such notification shall be construed as a decision to extend the contract.*

"C.   Notwithstanding the foregoing, the total duration of this Contract, including the exercise of the option, shall not extend beyond June 30, 1997.

.          .          .          .          .          .

"F.   This contract may be terminated by mutual consent of the Principal Parties as of the end of any calendar month, provided that at least thirty (30) days advance written notice thereof is given to each of the Approving Parties.

"G.   The Owner may terminate this Contract if it is determined that the Contractor consistently fails to comply with the regulations or requirements. The Owner will provide full evidence of causes for termination and efforts made by Owner to have Contractor correct deficiencies. Such terminations shall require concurrence of HUD.

"H.   Any termination of this Contract for any reason whatsoever must have the prior written approval of HUD.

"I.   It is expressly understood and agreed by and between the Principal Parties that HUD shall have the right to terminate this Contract at the end of any calendar month, with cause, on thirty (30) days advance written notice to each of the Principal Parties. The contractor shall not incur in any obligations or issue any work orders beyond the expected termination or expiration date of this Contract. Further, any subcontract to be entered into between the Contractor and any other party will have a clause stating that it will terminate not later than the expiration date of this Contract or upon its termination for any other cause." (Énfasis suplido.)

según transcrito anteriormente.([3]) Éstos expiraron el 30 de junio de 1995, sin que el Departamento hubiese realizado una evaluación (*assesment*) de los servicios prestados por los demandantes.([4])

El 9 de marzo de 1995, 90 días antes de que expirase el término original de tres años, se le notificó a las compañías demandantes la decisión de no ejercer la opción de extender el término de los contratos. La H.U.D. había aprobado la decisión del E.L.A. de no renovar los contratos, no sin antes haberse negado a ello en varias ocasiones.

Descontentos con tal determinación y al ser infructuosas las gestiones para que se les extendiese el término de duración del contrato, los demandantes acudieron al Tribunal de Primera Instancia. Pidieron allí que se emitiese una sentencia declaratoria con respecto a los derechos que reclamaban, una orden de *injunction* para que se paralizara el nuevo proceso de subasta y que se les adjudicasen compensaciones por los daños ocasionados.([5]) Sostuvieron que se incumplió el contrato, pues éste exigía que se ejerciese la opción, a menos que del análisis objetivo de la labor rendida se concluyese que no se estaba satisfecho con ésta. Basaron sus peticiones en la aludida Sec. A del Art. F-1 de los contratos.

El 8 de septiembre de 1995, el foro de instancia desestimó las demandas ya consolidadas, mediante una sentencia sumaria. Basó su decisión en que la cláusula en controversia era clara, por lo que no había que auscultar otras fuentes. Según sostuvo dicho foro, una vez se cumplió con el trámite de la Sec. B del Art. F-1, no era necesario proceder según lo dispuesto en la Sec. A del mismo artículo. El

---

([3]) La compañía Zeta Enterprises, Inc. obtuvo contratos para administrar las áreas 1, 9 y 22; Rexset, la 18, 20, 21 y 23; Westfal, la 5 y 17; MAS, la 11 y 14, y M.J., la 4 y 26.

([4]) El 8 de mayo de 1995, antes de la consolidación, se celebró una vista de uno de los casos de autos y un representante de la parte demandada declaró que nunca se hizo una evaluación de los méritos de la administración.

([5]) Originalmente se presentaron dos demandas independientes, las cuales fueron consolidadas en el caso de autos.

Tribunal de Circuito de Apelaciones confirmó esta determinación el 18 de diciembre de 1996.

Las partes demandantes acudieron ante nos para pedir, entre otras cosas, que se dictase una sentencia sumaria a su favor.[6] El 25 de marzo de 1997 emitimos una orden de mostrar causa por la cual este Tribunal no debía revocar la sentencia recurrida y sí dictar sentencia sumaria a favor de la parte demandante. Contando con la comparecencia de la parte recurrida, estamos en posición de resolver, según lo intimado anteriormente.

## II

Antes de adjudicar la controversia de autos, es necesario determinar si era procedente que se utilizase aquí la vía de la sentencia sumaria. Examinados los documentos de autos, coincidimos en que no existe controversia con respecto a los hechos pertinentes, sino más bien sobre las consecuencias jurídicas de éstos. Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Por ello estamos de acuerdo con el foro de instancia y el foro apelativo en que el uso de tal mecanismo en este caso era adecuado. Véanse al respecto: *Marín v. American Int'l. Ins. Co. of P.R.*, 137 D.P.R. 356 (1994); *Pilot Life Ins. Co. v. Crespo Martínez*, 136 D.P.R. 624 (1994); *Worldwide Food Dis., Inc. v. Colón et al.*, 133 D.P.R. 827 (1993); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714 (1986).

---

[6] Los errores señalados son:

"A.   Erró el Tribunal de Circuito de Apelaciones al no concluir que el Tribunal de Primera Instancia se equivocó al dictar sentencia sumaria a favor de la parte demandada a base de la indebida exclusión de prueba testifical contenida en deposiciones y declaraciones juradas.

"B.   Erró el Tribunal de Circuito de Apelaciones al no concluir que el Tribunal de Primera Instancia se equivocó al no resolver que el contrato entre los demandantes y la AVP obligaba a realizar una evaluación objetiva sobre cuya base se determinaría la extensión del contrato de administración de residenciales.

"C.   Erró el Tribunal de Circuito de Apelaciones al no concluir que el Tribunal de Primera Instancia se equivocó al no dictar sentencia sumaria a favor de los demandantes y apelantes."

■ Aclarando este asunto, pasemos a interpretar los términos del contrato conforme lo dispone la norma fundamental para ello de nuestro ordenamiento jurídico, el Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471.([7]) *Marina Ind., Inc. v. Brown Bovery Corp.*, 114 D.P.R. 64 (1983); *Coop. La Sagrada Familia v. Castillo*, 107 D.P.R. 405 (1978); *Merle v. West Bend Co.*, 97 D.P.R. 403 (1969). Si de los términos del contrato se desprende con claridad que al pactar se pretendió que el aviso de terminación del contrato, notificado noventa (90) días antes del término de su expiración, hacía innecesaria la evaluación del servicio prestado por los demandantes, tendríamos que resolver que la parte demandada actuó correctamente debido a que ésta cumplió con dicha notificación. Habría que resolver la controversia a favor de la parte recurrida, puesto que ésta no habría incurrido en un incumplimiento contractual. Por el contrario, si era compulsorio efectuar la evaluación aludida, tendríamos entonces que determinar si ésta se llevó a cabo cuando la parte demandada decidió no extender el término del contrato.

### III

Respecto al significado de la Cláusula A del Art. F-1 del contrato, los foros inferiores y la parte recurrida difieren en cuanto a su interpretación. El Tribunal de Primera Instancia entendió que la evaluación de la que habla la Cláusula A es una en los méritos, la cual sólo es necesaria efectuar si la entidad gubernamental está considerando ejercer la opción afirmativamente. Siguiendo ese razonamiento, como se les avisó de la intención de no ejercer la opción 90 días antes del vencimiento del término, no existía obliga-

---

([7]) El Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471, dispone:

"Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.

"Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas."

ción de hacer la evaluación.[8] Por su parte, el Tribunal de Circuito de Apelaciones entendió que dicha cláusula se debía interpretar alterando el orden de sus incisos. Habría que leer en primer lugar su inciso (B), el cual exige que el Estado le notifique a la compañía privatizadora la decisión de no extender el contrato con 90 días de anticipación.[9] De esta manera, el primer inciso, que es el único que cualifica el ejercicio de la opción, queda supeditado al inciso subsiguiente. El foro apelativo no fundamentó tal postura y, además, nada dijo sobre si la evaluación aludida debía ser en los méritos o únicamente sobre los términos del contrato.

Por su parte, los recurridos también sostienen que la evaluación es innecesaria, salvo que se esté considerando ejercer la prórroga. Aducen que la notificación a la otra parte, con noventa (90) días de antelación a la expiración del contrato, era suficiente para terminarlo sin una evaluación previa. Aducen, además, que aun si se estuviese considerando ejercer la opción, dicha evaluación no tendría que ser en los méritos.

Por último, los recurrentes sostienen que la mencionada cláusula significa que es mandatorio ejercer la opción, a menos que de la evaluación del desempeño de los administradores se desprendiese que la extensión del contrato no era conveniente. Si ocurriese este último supuesto, entonces es que se tendría que dar aviso sobre ello con noventa (90) días de anticipación a la expiración del contrato. La evaluación aludida —alegan éstos— necesariamente tendría que haber sido sobre la calidad de la ejecutoria de los administradores, no sobre la conveniencia contrato, pues esta última se determinó ya al momento de suscribir el contrato. Concluyen que como nunca se efectuó la evaluación en los méritos, lo procedente era extender el contrato. Tienen razón los recurrentes.

---

[8] Sentencia de 8 de septiembre de 1995, pág. 23 esc. 4.

[9] Sentencia de 18 de diciembre de 1996, pág. 14.

Es evidente, de un análisis contextual de los términos de todas las cláusulas del Art. F-1 que las partes al suscribir el acuerdo tenían una expectativa de conservación de la relación contractual. Se exigió el consentimiento escrito de la H.U.D. como requisito para no extender la duración del contrato y para cualquier otro tipo de terminación. Se acordó que si se decidía no ejercer la opción, habría que notificarle tal decisión a tiempo a las compañías, o el contrato se consideraría extendido automáticamente. Se proveyó para la terminación de la relación antes de cumplirse el término original, pero sólo si había evidencia de un incumplimiento constante con los requerimientos y las regulaciones, y de los esfuerzos del Gobierno para que los contratistas corrigiesen las deficiencias. Se impusieron cortapisas a cada uno de los procesos que acabarían con la contratación del servicio antes de la fecha límite final: 30 de junio de 1997.

De especial importancia en este sentido es la redacción de la primera cláusula del Art. F-1 del contrato. Ésta, la A, es la que establece la opción de extender el término inicial del contrato. Nótese que al establecerse en esta cláusula la referida opción, se utiliza el término imperativo *shall* respecto al ejercicio de ésta.([10]) Tal opción sólo está supeditada a que se efectúe una evaluación.([11]) Nótese, además, que cuando se habla de la evaluación o *assessment*, también se utiliza el mismo término imperativo con respecto a su realización. Asimismo, se utiliza el término *shall* por tercera vez para indicar que se extenderá el contrato, a menos que se haya hecho una determinación de no hacerlo y se obtenga para ello la aprobación de la agencia federal.([12])

---

([10]) "There shall be one (1) additional two-years option period."

([11]) "At the end of Fiscal year ending 1995, the Owner shall make an assessment to determine whether the contract should be extended for an additional two-year, option period."

([12]) "The Owner with HUD approval shall extend the term of the Contract for the additional two years option period unless a determination is made, with HUD

De lo anterior surge claramente· la obligatoriedad de efectuar una evaluación (*assesment*) como base para decidir si se ejercita la opción de extensión del contrato. Primero, se dice en términos imperativos que habrá una opción e, inmediatamente, que se efectuará una evaluación para determinar si ésta se ejecuta.[13] La cláusula referida no dice que la evaluación se realizara sólo si no se notifica la intención de no extenderlo con 90 días de antelación a la expiración del contrato, como aduce la recurrida y como resolvieron los foros inferiores. No hay base lógica alguna en los términos del contrato para tal interpretación.

Tampoco es correcto el malabarismo del foro apelativo para interpretar el contrato, de saltar de la Cláusula A a la B y luego de la B a la A, para entender así el sentido de la Cláusula A. Nada sugiere que esta cláusula está supeditada a la B y que, por lo tanto, debe interpretarse a partir de lo que dispone la B. Lo lógico sería exactamente lo contario; es decir, en la cláusula inicial se dispone lo principal y en la claúsula subsiguiente se establece el procedimiento, en caso de que no se realice lo establecido en la Cláusula A. En dicha Cláusula A se dispone con meridiana claridad que el Departamento extenderá el contrato por un término adicional de dos años, si ello se justifica, con arreglo a una evaluación de los servicios prestados por los demandantes. Si de tal evaluación surge que no deben extenderse los contratos, entonces ello debe noficarse a éstos, como dispone la Cláusula B.

La recurrida sostiene que la evaluación no puede ser un requisito para el ejercicio de la opción porque la naturaleza

---

approval, not to exercise the option to extend."

(13) Nótese que, según el Request for Proposal (R.F.P.), la duración del contrato hubiese sido de dos años, con dos opciones de dos años cada una. Éste fue enmendado, por lo que el término pactado fue de tres años con una opción de dos años. Esto sustenta la posición de que la evaluación siempre fue necesaria, por lo que se aumentó el término de duración del contrato para poder efectuarse ésta de una manera más eficiente.

del término "opción" implica que está sujeta a la voluntad del poseedor.([14])

■ No tiene razón. El alcance de la opción aludida no se puede fijar sin tomar en cuenta el contenido específico que en este contrato se le imparte. Una opción típica implica que el poseedor del derecho tiene la iniciativa de decidir, a su arbitrio y dentro de un plazo ya fijado, si se va a celebrar el contrato. J. Puig Brutau, *Fundamentos de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1983, T. III, Vol. 3, págs. 491–501; F. Puig Peña, *Compendio de Derecho Civil Español*, Barcelona, Eds. Nauta, 1966, T. I, págs. 535–540. Sin embargo, en el contrato que nos concierne, el poseedor del derecho de opción no dispone de un ámbito ilimitado de voluntariedad, sino que su derecho está expresamente supeditado al cumplimiento de dos condiciones: la celebración de la evaluación y la obtención del permiso de la H.U.D. Estas disposiciones cualifican el ámbito de la opción, conforme a la voluntad de las partes contratantes.

Resolvemos, pues, que era necesario haber efectuado la evaluación para cumplir con los términos contractuales y que no bastó con notificar la intención de no extender con 90 días de anticipación a la fecha de expiración. Procede, entonces, que examinemos la naturaleza de dicha evaluación.

## IV

En el contrato no se define el significado del término *assessment*. El E.L.A. aduce que la evaluación se refiere a

---

([14]) También fundamentan su posición en que en el documento de *Preguntas y Respuestas* se incluyó lo siguiente:

"53. What option does the M.A. have to renew or cancel the contract?

*"The option to renew the contract belongs to the Owner. See Article F.1 Section A.* The option to cancel the contract must be by mutual agreement. See Article F-1 Section F1." (Énfasis suplido.)

Como puede observarse, en la contestación a la pregunta Núm. 53 se remite al Art. F-1, Sec. A. Dicho artículo no apoya la posición de la recurrida, como ya hemos señalado.

los términos del contrato, mientras que los demandantes alegan que se trata de una evaluación de los servicios prestados.

■ Conforme a varias reglamentaciones de la H.U.D. en el área relacionada con contratos de administración de vivienda pública, cuando se utiliza la palabra *assessment* y sus derivados, ésta se refiere claramente a una evaluación de los méritos de la ejecución (*performance*) de las responsabilidades que tiene la parte que administra la vivienda pública. Así pues, existe un proceso de evaluación llamado *Public Housing Management Assessment Program* (en adelante P.H.M.A.P.), con el cual la H.U.D. evalúa los sistemas de vivienda pública estatales (P.H.A.). En 24 C.F.R. sec. 901.01 (1992) se establecen los objetivos de ésta, y expone en lo relativo al proceso evaluativo lo siguiente:

"c) *PHMAP provides an objective system for measuring PHA performance using standard criteria for all PHAs that will enable the Department and PHAs to compare performance of PHAs.* At the same time, PHMAP provides sufficient flexibility in evaluating PHAs to ensure that they are not penalized as a result of circumstances beyond their control.

d) *With PHMAP, the Department will be able to identify deficiencies in a PHAs management areas and take corrective actions,* such as providing advice and guidance in specific areas of concern, or entering into a Memorandum of Agreement with a troubled PHA. ...

e) *PHMAP will be used by the Department to provide incentives to high-performing PHAs and encourage all PHAs to achieve high-performer designation.* High-performing PHAs are afforded greater flexibility in the operation of their public housing programs, with increased responsibility and authority for their own management decisions. In addition, high-performing PHAs will receive national recognition by the Department.

f) *PHAs can utilize this assessment to conduct internal audits of their operations and correct identifies deficiencies.* The results of the assessment can be utilized by the PHAs Board of Commissioners and Executive Director, resident organizations, and the community to understand more comprehensively by the PHA's operations." (Énfasis suplido.) 24 C.F.R. sec.

901.01(c)-(f) (1992), según citado en la Moción de sentencia sumaria, pág. 14.

Con respecto a dicha sección, el trasfondo de la regla interina implantando el P.H.M.A.P. dice:

> ... *The intent of PHMAP is to be as objective as possible.* Indicators are based on numerical data, whenever appropriate. The Department also recognizes that a cold, hard, objectivity based entirely on numerical data may not always be appropriate. For this reason, the Regional Administrator has the discretion to review and verify a PHA's score prior to the transmission of the score the PHA. To avoid the abuse, or even the appearance of abuse, of this discretion, the PHMAP process is an open record.[15] (Énfasis suplido.)

### El preámbulo de dicha regla interina dice, en parte:

> Once the necessary management information is compiled, it will be evaluated. This will be done by grading or scoring the management performance of each PHA in accordance with uniform and objective criteria. *Finally, when the management performance of a PHA has been accurately described and fairly evaluated, the rule prescribes, what action follow.* High-performing PHAs will be rewarded for their excellence. In this way, all PHAs will be encouraged to achieve this status. Troubled PHAs ... will be assisted in improving their management performance by focusing resources on the deficiencies identified by the management assessment.[16] (Énfasis suplido.)

En el trasfondo de la regla interina se expone, en su parte pertinente:

> ... *Congress recognized the need to identify and assist troubled and mod-troubled PHAs and to provide for the consistent good management of PHAs in Section 502 of NAHA. Section 502 requires the Department to develop indicators to assess the management performance of PHAs.* ... A PHA assessed as troubled or mod-troubled must enter into a Memorandum of Agreement (MOA) with HUD that sets forth targets, strategies, incentives and sanctions for improving its management performance.[17] (Énfasis suplido.)

---

[15] 57 Fed.Reg. 2167 (1992).

[16] 57 Fed.Reg. 2188 (1992).

[17] 57 Fed.Reg. 2161 (1992).

Posteriormente, en el trasfondo también se expresa:

> The 1992 Appropriations Act amends NAHA Section 502 in four ways: the number of factors that may be used to assess the management performance of PHAs is limited; the evaluation of PHAs must be administered flexibly to ensure that they are not penalized for circumstances beyond their control; the weights assigned to indicators must reflect the differences in management difficulty that result from physical condition and neighborhood environment; *and the determination of PHA's status as "troubled with respect to the program under section 14" is to be based on factors solely related to its ability to carry out that program.*[18] (Énfasis suplido.)

Si bien es cierto que la reglamentación aludida no era aplicable entre las partes, también es cierto que los contratantes estaban familiarizados con ésta, y sabían que el concepto *assessment* se refería a una evaluación de los méritos del servicio prestado. No tenemos fundamentos para concluir que a pesar de lo anterior, cuando las partes en este contrato incluyeron el término en los contratos, sin definirlo, estaban pensando en impartirle un significado diferente al que se acostumbraba a utilizar cuando se manejaba el término en el mismo campo.

También son indicativos de lo que consistía el *assessment* ciertos actos posteriores de la parte recurrida. Recuérdese que según dispone la Cláusula A del Art. F-1, era necesaria la autorización de la H.U.D. para que el E.L.A. no extendiese el contrato al expirar el término original. Durante la etapa de obtención de dicho permiso, se desarrolló un diálogo escrito entre funcionarios de ambas entidades.

El 11 de noviembre de 1994, el Administrador de la Administración de Vivienda Pública[19] (en adelante la A.V.P.) envió una carta al Director de la Oficina del Caribe de

---

[18] 57 Fed.Reg. 2161 (1992).

[19] Esta institución está adscrita al Departamento de Vivienda y es la propietaria de los residenciales públicos.

H.U.D. para solicitar su autorización, la cual era necesaria para la no renovación de los contratos.

El 8 de diciembre de dicho año, el Director de la División de Operaciones de H.U.D. de la Oficina del Caribe negó la autorización solicitada y contestó la pasada comunicación, explicando las razones para denegar la solicitud, de la manera siguiente:

> ... As required in Part I, Section F, Article F-1A of the RFP, "the Owner shall make an assessment to determine whether the Contract should be extended for an additional two years option period." HUD's approval may be requested after a determination is made by the PHA[20] based on the assessment to either extend or not to exercise the option to extend. *Your letter does not clearly state your position and it only provides statements concerning the current contracts.*
>
> *The PHA must submit a clear and definite request concerning the plans to either extend or not the current contracts based on an objective assessment.* (Énfasis suplido.)

Surge de esta comunicación, con claridad, que H.U.D. se negaba a autorizar la no renovación de los contratos, porque no había realizado una evaluación objetiva del servicio prestado. La A.V.P. no cuestionó este planteamiento de H.U.D.

Todo lo anterior nos convence de que la evaluación que se exige en los contratos no podía ser otra que de los méritos de la ejecutoria de los administradores. En vista de que no se efectuó dicha evaluación, concluimos que no existe controversia sobre el hecho de que el E.L.A. incurrió en incumplimiento contractual. Por ello, *se dictará sentencia sumaria parcial para revocar la resolución del Tribunal de Circuito de Apelaciones en el caso de autos y para declarar con lugar las demandas por incumplimiento contractual. Se devuelve el caso al Tribunal de Primera Instancia para que adjudique el remedio procedente en derecho.*

---

[20] Las siglas P.H.A. se refieren en dicha correspondencia a la Administración de Vivienda Pública, al igual que las siglas P.R.P.H.A.

El Juez Asociado Señor Corrada Del Río disintió con una opinión escrita. El Juez Asociado Señor Rebollo López disintió sin opinión escrita. El Juez Asociado Señor Negrón García se inhibió. El Juez Asociado Señor Hernández Denton no intervino.

— O —

Opinión disidente emitida por el Juez Asociado Señor Corrada Del Río.

I

En julio de 1992, los demandantes del epígrafe suscribieron junto a la Administración de Vivienda Pública (en adelante la A.V.P.) unos contratos de administración de residenciales públicos como parte de un programa de descentralización y privatización en la administración y el mantenimiento de las viviendas públicas en Puerto Rico. En dichos contratos también comparecieron el Departamento de la Vivienda de Puerto Rico y el *Department for Housing and Urban Development* (en adelante H.U.D.), este último debido a que el programa sería financiado por el Gobierno federal.

Sirvió como base de los contratos de administración un documento titulado *Request for Proposal* (en adelante el R.F.P.), en cuya elaboración participaron conjuntamente funcionarios de H.U.D. y del Estado Libre Asociado (en adelante el E.L.A.). El R.F.P. fue publicado en un diario de circulación general, el cual invitaba a las compañías privadas interesadas a que sometieran propuestas para la administración y el mantenimiento de los residenciales públicos. Dicha publicación señaló la fecha de 29 de mayo de 1992 para la celebración de una reunión previa a la adjudicación de los contratos (*prebid meeting*) con el objeto de aclarar las dudas que pudieran surgir del R.F.P. A la

reunión asistieron funcionarios de H.U.D., de la A.V.P., del Departamento de la Vivienda, de la Autoridad de Edificios Públicos al igual que representántes de las compañías licitadoras, entre las que se encontraban los demandantes, y en ella surgieron una serie de interrogantes relacionadas con la contratación. Las interrogantes fueron recogidas en un documento titulado *Preguntas y Respuestas*, el cual modificó y formó parte del contrato como anejo y cuyo carácter vinculante fue aceptado por las partes.([1])

El contrato tendría una vigencia de tres (3) años a partir del 1ro de octubre de 1992 y finalizaría el 30 de junio de 1995, con la posibilidad de ser extendido por un término adicional de dos (2) años. La redacción final del contrato, según firmado por las partes, dispone, en sus partes pertinentes, lo siguiente:

### SECTION F–CONTRACT PERIOD

*Article F-1–Term of Contract, Option and Commencement of Work*

A.   This contract shall become effective on the date of its approval by HUD and shall cover the period of August 1, 1992 to June 30, 1995. There shall be one (1) additional two-years option period. At the end of Fiscal year 1995, the Owner shall make an assessment to determine whether the Contract should be extended for an additional two-year option period. The Owner with HUD approval, shall extend the term of the Contract for the additional two years option period unless a determination is made, with HUD approval, not to exercise the option to extend.

B.   The owner shall give the Contractor a preliminary notice of its intent not to extend the Contract at least 90 days prior to the expiration of the initial term. Failure by the Owner to make such notification shall be construed as a decision to extend the contract.

---

([1]) En la pregunta Núm. 18 se señala que el *Request for Proposal* (en adelante el R.F.P.) fue enmendado por las respuestas a las preguntas y todas las demás clarificaciones contenidas en el documento de *Preguntas y Respuestas*.

C. Notwithstanding the foregoing, the total duration of this Contract, including the exercise of the option, shall not extend beyond June 30, 1997.

. . . . . . . .

F. This contract may be terminated by mutual consent of the Principal Parties as of the end of any calendar month, provided that at least thirty (30) days advance written notice thereof is given to each of the Approving Parties.

G. The Owner may terminate this Contract if it is determined that the Contractor consistently fails to comply with the regulations or requirements. The Owner will provide full evidence of causes for termination and efforts made by the Owner to have the Contractor correct deficiencies. Such terminations shall require concurrence of HUD.

H. Any termination of this Contract for any reason whatsoever must have the prior written approval of HUD.

I. It is expressly understood and agreed by and between the Principal Parties that H.U.D. shall have the right to terminate this Contract at the end of any calendar month, with cause, on thirty (30) days advance written notice to each of the Principal Parties.

J. The Contractor shall not incur in any obligations or issue any work orders beyond the expected termination or expiration date of this Contract. Further, any subcontract to be entered into between the Contractor and any other party will have a clause stating that it will terminate not later than the expiration date of this Contract or upon its termination for any other cause. Apéndice, págs. 740–741.

Sin embargo, el 9 de marzo de 1995 la A.V.P. le notificó a todos los administradores, con la aprobación previa de H.U.D., que no ejercería la opción de renovar los contratos más allá de la fecha de expiración de 30 de junio de 1995, debido a que se iba a llevar a cabo un nuevo requerimiento de propuestas para la adjudicación de nuevos contratos de la administración de los residenciales públicos.[2] Las razones de la A.V.P. para no renovar los contratos consistían en que la redacción de éstos adolecía de serias deficiencias

---

[2] Nótese que de los once (11) administradores contratados, nueve (9) de ellos comparecieron a la nueva subasta. Todos, excepto uno (1) de los nueve (9), fueron recontratados por la Administración de la Vivienda Pública (en adelante la A.V.P.) bajo unos términos y condiciones mucho más favorables para los residentes y el erario.

que impedían la administración eficiente de los residenciales. Entre las deficiencias identificadas se señaló que los contratos no protegían de forma adecuada los derechos e intereses de la A.V.P. y de los residentes, que no permitían una supervisión adecuada de los contratantes, que la compensación de éstos era muy elevada y que los contratos no requerían una garantía o fianza.

Sorprendentemente, aún antes de haber recibido esta comunicación oficial de la A.V.P., los peticionarios ya habían instado el 6 de febrero de 1995 una demanda de *injunction*, sentencia declaratoria y daños contra los recurridos. En ella sostuvieron que la decisión sobre la extensión del contrato no era una prerrogativa opcional de la A.V.P., sino que ésta se encontraba obligada a realizar una evaluación "objetiva" de la labor de los contratistas, antes de tomar una determinación al respecto. Según los demandantes, si la evaluación era positiva, los contratos tenían que ser extendidos por el período de dos (2) años adicionales. Por ello, la no renovación de los contratos de administración, sin una evaluación previa, constituía una terminación unilateral que privaría a los peticionarios de sus derechos propietarios y les causaría cuantiosos daños económicos. Los demandantes solicitaron al Tribunal de Primera Instancia que paralizara el nuevo proceso de presentación de propuestas iniciado por la A.V.P.; que declarara que los demandantes tenían derecho a una evaluación "objetiva" de su trabajo y que sobre la base de ésta sus contratos debían extenderse por el período adicional de dos (2) años; que ordenara la realización de una evaluación "*a base de criterios compatibles con el contrato*", y que se les compensara por los daños ocasionados por la A.V.P. como consecuencia del incumplimiento de sus obligaciones contractuales. Los recurridos contestaron la demanda y rechazaron la obligatoriedad de la evaluación objetiva y de la extensión de los contratos. Luego de algunos incidentes procesales, durante los cuales se celebraron varias vistas

argumentativas y las partes sometieron memoriales de derecho, los demandantes presentaron ante el foro de instancia solicitudes para que se dictara una sentencia sumaria, acompañadas de transcripciones de deposiciones, declaraciones juradas y prueba documental. Los recurridos replicaron solicitando la desestimación de la demanda. Los demandantes duplicaron oportunamente oponiéndose a la desestimación.

Luego de estudiar las mociones, los memoriales de derecho y los argumentos presentados por las partes en las diversas vistas orales celebradas, el ilustrado tribunal de instancia dictó una exhaustiva y bien fundamentada sentencia sumaria, mediante la cual desestimó las demandas ya consolidadas y declaró que la A.V.P. tenía la potestad de no ejercer la opción de renovar los contratos sin antes tener que realizar una evaluación del desempeño de los agentes administradores. El 18 de diciembre de 1996 el Tribunal de Circuito de Apelaciones dictó una sentencia confirmatoria de la de instancia.

Inconformes, los demandantes recurren ante nos y solicitan que dictemos una sentencia sumaria a su favor y señalan los errores siguientes:

A. Erró el Tribunal de Circuito de Apelaciones al no concluir que el Tribunal de Primera Instancia se equivocó al dictar sentencia sumaria a favor de la parte demandada a base de la indebida exclusión de prueba testifical contenida en deposiciones y declaraciones juradas.

B. Erró el Tribunal de Circuito de Apelaciones al no concluir que el Tribunal de Primera Instancia se equivocó al no resolver que el contrato entre los demandantes y la AVP obligaba a realizar una evaluación objetiva sobre cuya base se determinaría la extensión del contrato de administración de residenciales.

C. Erró el Tribunal de Circuito de Apelaciones al concluir que el Tribunal de Primera Instancia no se equivocó al no dictar sentencia sumaria a favor de los demandantes y apelantes. Petición de *certiorari*, págs. 5–6.

El 25 de marzo de 1997 emitimos una resolución en la cual le ordenamos a los recurridos que mostraran causa

por la cual no debíamos revocar al Tribunal de Circuito de Apelaciones y dictar una sentencia sumaria a favor de los peticionarios.

Hoy, este Tribunal emite una opinión *per curiam* que revoca la sentencia del Tribunal de Circuito de Apelaciones y mediante la cual se dicta una sentencia sumaria parcial para declarar con lugar las demandas por incumplimiento de contrato. La opinión mayoritaria acoge el planteamiento presentado por los peticionarios, en cuanto a que la A.V.P. estaba obligada a realizar una evaluación antes de notificarle a los administradores su intención de no ejercer la opción de extender el contrato.

Respetuosamente disentimos por considerar que la opinión del Tribunal viola arbitrariamente los más básicos principios de hermenéutica en la interpretación contractual, imponiéndole de manera injustificada a la A.V.P. una obligación onerosa que no había sido pactada en los contratos de administración, todo ello en perjuicio del interés público. Veamos.

## II

El Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471, dispone, en cuanto a la interpretación de los contratos, que:

> Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.
>
> Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá esta sobre aquellas.

Por ello, cuando los términos de un contrato son lo bastante lúcidos como para ser entendidos en un único sentido, sin dar lugar a dudas o a diversidad de interpretaciones, el tribunal debe abstenerse de especular acerca de las posibles intenciones de las partes contratantes e interpretarlas conforme a la voluntad expresada por éstas al momento del perfeccionamiento del contrato.

El Código Civil también establece en su Art. 1237 (31 L.P.R.A. sec. 3475) que, como principio de hermenéutica en la interpretación contractual, "[l]as cláusulas de los contratos deberán interpretarse las unas por las otras, atribuyendo a las dudosas el sentido que resulte del conjunto de todas". Véanse, además: *Cervecería Corona v. Commonwealth Ins. Co.*, 115 D.P.R. 345, 348–349 (1984); *Carrillo Norat v. Camejo*, 107 D.P.R. 132, 138 (1978); *San Miguel Fertil. Corp. v. P.R. Drydock*, 94 D.P.R. 424 (1967); *Ulpiano Casal, Inc. v. Totty Mfg. Corp.*, 90 D.P.R. 739 (1964); *Caballero v. Kogan*, 73 D.P.R. 666 (1952); *P. López & Co. v. Mayagüez D. & S. Co.*, 18 D.P.R. 396 (1912).

El error primordial en el cual incurre la mayoría estriba en su interpretación de que los peticionarios tenían, al firmar el acuerdo de administración, una expectativa de conservación de la relación contractual más allá del término de tres (3) años. En apoyo de esta afirmación se hace alusión al Art. F-1(A) del contrato, en el cual se exige el consentimiento de H.U.D. como condición para no extender los contratos por el término adicional de dos (2) años. Sin embargo, la mayoría soslaya el hecho de que, conforme al mismo artículo, la aprobación por escrito de H.U.D. también era necesaria *para extender los contratos* por el período opcional y, como ya hemos indicado, dicha agencia federal prestó su consentimiento *para no renovar los contratos.*

La opinión mayoritaria señala, además, como segundo fundamento para demostrar la existencia de una expectativa de continuidad, que conforme al Art. F-1(B), si la A.V.P. no notificaba oportunamente su decisión de no ejercer la opción de renovación, "el contrato se consideraría extendido automáticamente". Opinión *per curiam*, pág. 8. Tal afirmación es totalmente errónea, toda vez que el Art. F-1(B) no dispone que el contrato se considerará como extendido automáticamente, sino que la falta de notificación con noventa (90) días de antelación a su expiración (30 de

junio de 1995) se entenderá como una decisión de extender el contrato.([3])

Precisamente, esta redacción avala la teoría de los recurridos debido a que la ausencia de una notificación oportuna de la intención por parte de A.V.P. de no renovar el contrato, no provoca la renovación automática del contrato como incorrectamente sostiene la opinión mayoritaria, sino que tiene el mismo efecto que tendría la decisión de ejercer la opción. Es decir, la ausencia de notificación antes del término de noventa (90) días activa la necesidad de realizar una evaluación de la labor de los administradores, y en caso de que en ella se obtuviese un resultado positivo, la A.V.P. debía entonces ejercer la opción de renovar, no sin antes haber notificado tal intención a H.U.D., quien debía prestar por escrito su consentimiento para ello. Por el contrario, si a la A.V.P. no le interesaba ejercer la opción de extender el contrato, sólo bastaba con notificar a los administradores con noventa (90) días de anticipación antes de la fecha de expiración de 30 de junio de 1995, abriéndose así el proceso a la libre competencia de la pública licitación y presentación de propuestas y lo cual haría totalmente innecesaria la evaluación.

Disentimos de la opinión mayoritaria puesto que, luego de una lectura integrada de las cláusulas del contrato, no podemos concluir que las partes tenían una expectativa legítima de continuación de la relación contractual más allá del término convenido de tres (3) años. La primera oración del Art. F-1(A) del citado contrato es inequívoca al señalar que la vigencia del acuerdo estaría enmarcada dentro del período comprendido entre el 1ro de agosto de 1992 y el 30 de junio de 1995.([4]) Asimismo, la ausencia de una expectativa legítima de continuidad queda reflejada

---

([3]) "Failure by the Owner to make such notification shall be construed as a decision to extend the contract." Art. F-1(B) del contrato de administración.

([4]) "This contract shall become effective on the date of its approval by HUD and shall cover the period of August 1, 1992 to June 30, 1995." Apéndice, pág. 74.

diáfanamente al leer el inciso (A) conjuntamente con el inciso (J) del mismo artículo. Dicho inciso dispone que:

> J. The Contractor shall not incurr in any obligations or issue any work orders beyond the expected termination or expiration date of this Contract. Further, any subcontract to be entered into between the Contractor and any other party will have a clause stating that it will terminate not later than the expiration date of this Contract or upon its termination for any other cause. Apéndice, pág. 65.

Este inciso demuestra que existen dos (2) instancias distintas en las cuales puede finalizar la relación contractual entre las partes: la fecha de expiración y la de terminación del contrato. La terminación del contrato se podía producir de dos (2) maneras: por mutuo acuerdo o por justa causa. Véanse los incisos (F) y (G) del Art. F-1 del contrato.

Sin embargo, la expiración del contrato se produce con el transcurso del término inicial de tres (3) años, una vez se haya notificado la decisión de no ejercer la opción de renovar el contrato. Los contratistas quedaban, por lo tanto, impedidos de incurrir en obligaciones más allá de cualesquiera de las dos (2) fechas, por lo que se colige que aun cuando el administrador estuviese cumpliendo con sus obligaciones contractuales, el contrato podía no ser renovado y expirar sin la necesidad de realizar una evaluación previa. Como bien concluye el tribunal de instancia en su sentencia, el hecho de que el contrato le prohibiera específicamente al contratista obligarse más allá de la fecha prevista para la expiración del contrato, es un elemento importante en la determinación de la existencia o inexistencia de una expectativa legítima de renovación.

Por otro lado, la opinión mayoritaria también sostiene que la utilización del término imperativo *shall* en el Art. F-1(A) con relación a la existencia y el ejercicio de la opción, al igual que con respecto a la realización de la evaluación de la labor de los administradores, avala la teoría de la existencia de una expectativa de renovación del contrato. Se señala, además, que dicho lenguaje hacía obli-

gatoria la realización de la evaluación y, en caso de que ésta arrojase un resultado positivo, el ejercicio de la opción sería también obligatorio.

Sin embargo, como bien señaló el ilustre tribunal sentenciador, el significado de una frase en un artículo no puede aislarse del resto del contrato puesto que, conforme a los principios de hermenéutica legal, las cláusulas deben interpretarse conjuntamente, atribuyendo a las dudosas el sentido que resulte del conjunto de todas. Art. 1237 del Código Civil de Puerto Rico, *supra*. Así pues, la interpretación que la mayoría hace del término imperativo *shall* en el Art. F-1(a) no es reconciliable con lo establecido en el Art. B-2(B) del contrato de administración, en el que se refleja de forma más explícita la naturaleza *opcional* de la renovación de los contratos. Este último artículo dispone:

> At the expiration of the initial contract term the Owner *may*, with prior H.U.D. written approval, renew the management contract(s) for one additional two-years term.

Claramente el contrato dispone que la A.V.P. podía —si así lo consideraba oportuno— ejercer la *opción* de renovar el contrato, siempre y cuando contara con la aprobación previa de H.U.D. También debemos señalar que durante el intercambio de preguntas y respuestas suscitado en la reunión previa a la adjudicación de los contratos (*prebid meeting*) se discutieron, entre otras cosas, las prerrogativas y expectativas de los contratantes en cuanto a la renovación, terminación o cancelación de los contratos. Se les indicó a los licitadores que la opción de renovar el contrato pertenecía exclusivamente al dueño y que, en cambio, la cancelación del contrato sería por el consentimiento de las partes. Como producto de esta reunión se preparó el documento titulado *Preguntas y Respuestas* que —como dijéramos anteriormente— modificó al R.F.P. e incluso se hizo formar parte del contrato como anejo y fue aceptado como vinculante por las partes. La pregunta Núm. 53 de las *Preguntas y Respuestas* expone lo siguiente:

53.   What option does the M.A. have to renew or cancel the contract?

The *option to renew the contract belongs to the Owner.* See Article F-1 Section A. The option to cancel the contract must be by mutual agreement. See Article F-1 Section F. (Énfasis suplido.)

Ciertamente, una lectura desapasionada e integrada de las cláusulas del contrato de administración refleja sin ambigüedad que la evaluación era necesaria únicamente en caso de que la A.V.P. optara por extender el contrato por el período adicional de dos (2) años. Veamos.

El Art. F-1(A) del contrato dispone:

A.   This contract shall become effective on the date of its approval by HUD and shall cover the period of August 1, 1992 to June 30, 1995. There shall be one (1) additional two years option period. At the end of Fiscal Year 1995, the Owner shall make an assessment to determine whether the contract should be extended for an additional two-year option period. The Owner with HUD approval, shall extend the term of the Contract for the additional two years option period unless a determination is made, with H.U.D. approval, not to exercise the option to extend. Apéndice, págs. 740–741.

A los fines de determinar si procedía el ejercicio de la opción de extender el contrato por dos (2) años adicionales, la A.V.P. debía realizar una evaluación al finalizar el año fiscal 1995.[5] De dicha cláusula se desprende que la evaluación debía realizarse si la A.V.P. consideraba oportuno renovar los contratos por el período opcional de dos (2) años. De esta forma, una vez realizada la evaluación, la A.V.P. podía, *con el consentimiento previo de H.U.D.*, extender el contrato por el término adicional de dos (2) años. Sin embargo, el contrato no especifica las consecuencias de una evaluación positiva o negativa de la labor del administra-

---

[5] El contrato no indica si el año fiscal al que hace referencia es el de Puerto Rico, que finaliza en 30 de junio, o el federal, que finaliza en 30 de septiembre. Sin embargo, aunque presumimos que el contrato se refiere al año fiscal de Puerto Rico, debido a que tanto éste como el contrato expiran en junio, tal aclaración no es de particular relevancia en la interpretación del contrato.

dor, sino que sólo se condiciona la renovación del contrato por parte de la A.V.P. a la aprobación previa de H.U.D. De hecho, hasta se podría dar la situación de que aun habiéndose realizado una evaluación que arrojara un resultado positivo sobre la labor del administrador, la A.V.P. todavía podría escoger no ejercer la opción de extender el contrato, siempre que dicha determinación contara con la aprobación previa de H.U.D.([6]) Asimismo, debido a que el consentimiento de la agencia federal no está sujeto a limitación alguna en el contrato, también es posible interpretar el contrato de tal manera que H.U.D. podría negarse a aprobar la renovación por cualquier motivo y ante cualquier circunstancia, incluso aun cuando la A.V.P. decidiera ejercer la opción de extender. Precisamente, el consentimiento previo por escrito de H.U.D. autorizando el ejercicio de la opción es una *conditio sine qua non* para la renovación del contrato, por lo que aún si acogiésemos la insólita tesis de que la evaluación era de carácter obligatorio en todos los casos, el consentimiento de la agencia federal *para que no se renovaran los contratos* representa una estocada mortal a la reclamación de los peticionarios e impide que se dicte una sentencia sumaria a favor de éstos.

Por otra parte, debido a la interpretación forzada que hace del contrato, la opinión del Tribunal incurre en un contrasentido al afirmar que el inciso (A) del Art. F-1 "dispone con meridiana claridad que el Departamento extenderá el contrato por un término adicional de dos años, si ello se justifica, con arreglo a una evaluación de los servicios prestados por los demandantes [*y si*] *de tal evaluación surge que no deben extenderse los contratos, entonces ello debe notificarse a éstos, como dispone la Cláusula* B". (Énfasis suplido.) Opinión *per curiam*, pág. 9. Tal aseveración es irreconciliable con los términos del contrato si interpre-

---

([6]) La última oración del inciso (A) dispone en español:

"El dueño, con la aprobación de HUD, extenderá el término del Contrato por el período adicional de dos (2) años del período de opción salvo que determine, con la aprobación del HUD, no ejercer la opción de extender." (Traducción nuestra.)

tamos conjuntamente los incisos (A) y (B) del Art. F-1. El Art. F-1(B) dispone:

> B.   The owner shall give the Contractor a preliminary notice of its intent not to extend the Contract at least 90 days prior to the expiration of the initial term. Failure by the Owner to make such notification shall be construed as a decision to extend the contract. Apéndice, pág. 741.

Allí se reconoce la facultad de la A.V.P. de no extender el contrato más allá del período inicial de tres (3) años, en cuyo caso existe la obligación de notificar oportunamente a los administradores. Ciertamente, sería absurdo interpretar el contrato de la manera que sugiere la mayoría, ya que si se exige dar notificación de la no renovación con noventa (90) días de antelación a la expiración del contrato (esto es, noventa (90) días antes del 30 de junio), no es posible requerir una evaluación previa a tal notificación, pues a tenor del Art. F-1(A) del contrato, la evaluación se realizaría al finalizar el año fiscal de 1995 (30 de junio). En cambio, es mucho más razonable y armonizable con las demás cláusulas del contrato la tesis propugnada por los recurridos de que la evaluación era necesaria solamente en la eventualidad de que el dueño considerara ejercer la opción de renovación del contrato, debido a que ésta sustituye el proceso de subasta o de presentación de propuestas a raíz del cual se van a comprometer fondos públicos.

A tenor de lo dispuesto por los Arts. 1233 y 1237 del Código Civil, *supra*, tanto el foro de instancia como el tribunal apelativo concluyeron correctamente que las cláusulas del contrato eran lo suficientemente claras como para desestimar las reclamaciones de los demandantes peticionarios sin necesidad de recurrir a prueba extrínseca para discernir la intención de los contratantes. Ambos tribunales inferiores resolvieron en sus sentencias que el Art. F-1 del contrato no exigía la realización de una evaluación de la labor de los administradores si la A.V.P. decidía, con la aprobación por escrito de H.U.D., no ejercer la opción de

renovar los contratos por el período adicional de dos (2) años y así lo notificaba oportunamente a los peticionarios. Consideramos que las sentencias recurridas son esencialmente correctas por ajustarse más fielmente a la normativa aplicable en la interpretación de los contratos y, como consecuencia, la interpretación en ellas realizada respeta la verdadera voluntad las partes al momento de perfeccionarse el contrato. Por ello confirmaríamos la sentencia del Tribunal de Circuito de Apelaciones.

### III

Por último, no comprendemos por qué la opinión del Tribunal recurre principalmente a las *reglas interinas* del Reglamento del *Public Housing Management Program* (en adelante P.H.M.A.P.) para definir el significado del término *assessment*. El P.H.M.A.P. es un reglamento utilizado por el H.U.D. para evaluar a las Autoridades de Vivienda Pública de los diversos estados de la Unión y, por lo tanto, no es aplicable a las partes contratantes. En ningún momento se alude a él en el contrato, en el R.F.P. ni en el documento de "Preguntas y Respuestas", por lo que nos desconcierta que el Tribunal lo acoja como fuente para definir el concepto del término *assessment*.

Los recurridos aducen, en cambio, que la evaluación podía ser sobre los términos del contrato y que, luego de haberse realizado, se determinó que el contrato, según redactado, no le permitía administrar el programa en forma eficiente. Esta determinación contó con el apoyo de H.U.D., mediante su consentimiento para no renovar los contratos y, por consiguiente, no vemos razón alguna por la cual este Tribunal debe acoger la acomodaticia definición que del término *assessment* hacen los peticionarios.([7]) Luego de

---

([7]) En una carta dirigida al Sr. Luis Falto, Presidente de Zeta Enterprises, Inc., el Sub Secretario Auxiliar de H.U.D. señaló, a nombre del Secretario de Vivienda federal, que: *"HUD granted this approval on the basis that the original 1992 procu-*

evaluar los contratos de administración, la A.V.P. determinó que la renovación contravenía el interés público debido a que según los contratos originales no se les requería a los contratistas que prestaran un *performance bond* al recibir la buena pro de la subasta. Los contratos tampoco disponían sobre un Plan de Iniciativa de Residentes ni un Plan de Seguridad Pública como parte de los criterios de selección. Por otro lado, con la nueva contratación se alcanzó un ahorro promedio de $6.20 dólares mensuales por unidad de vivienda, existiendo aproximadamente cincuenta y siete mil (57,000) unidades de vivienda. Por ello, luego de evaluar el contrato en sus méritos, la A.V.P. determinó que éste confligía con el interés público y decidió, conjuntamente con H.U.D., no renovar los contratos y abrir así la puerta a un nuevo proceso de licitación más razonable para los residentes y el erario.

## IV

Consideramos que los peticionarios no contaban con una expectativa de continuidad de las relaciones contractuales más allá de la fecha de expiración del acuerdo y, por lo tanto, la recurrida no tenía la obligación de realizar una evaluación de la labor realizada por los administradores si decidía no renovar los contratos y acudir de nuevo al procedimiento de licitación y solicitud de propuestas. En este caso, sólo era necesario que la A.V.P. le notificara oportunamente a los contratistas su intención de no ejercer la opción para extender el contrato por dos (2) años adicionales. A tenor de lo anterior, confirmaríamos la sentencia del Tribunal de Circuito de Apelaciones y disentimos de la opinión emitida hoy por este Tribunal. La acción de

---

*rement process was severely flawed and the resulting contract agreement between the selected property management companies and the PRPHA [was] substantially faulty.* HUD's approval was granted with the understanding that the new process would be improved with the implementation of certain significant changes in the revised request for proposals." Apéndice de la moción para mostrar causa, Anejo 17, pág. 173.

este Tribunal es contraria al Derecho, al interés público y a los más sanos principios de la administración pública.