**MEGA MEDIA HOLDINGS, INC., Plaintiff,**

v.

**AERCO BROADCASTING CORP., Defendant.**

**Civil No. 10–1279 (ADC).**

United States District Court, D. Puerto Rico.

March 30, 2012.

---

James W. McCartney, Cancio, Nadal, Rivera & Diaz, San Juan, PR, for Plaintiff.

Alejandro J. Cepeda–Diaz, Dora M. Penagaricano–Suarez, Richard M. Graffam–Rodriguez, McConnell Valdes, San Juan, PR, for Defendant.

## OPINION AND ORDER

AIDA M. DELGADO–COLÓN, Chief Judge.

Mega Media Holdings, Inc. ("Mega" or "plaintiff") brings suit against Aerco

Broadcasting Corp. ("Aerco" or "defendant"), alleging breach of two contracts: (1) a Programming Agreement (the "Programming Agreement") and (2) an Exclusivity and Option Agreement ("the Option Agreement"). **ECF No. 1.** Plaintiff alleges that such breaches stem from defendant's failure to comply with the terms of the Programming Agreement, and from defendant's refusal to refund plaintiff $2,000,000 as required by the Option Agreement in the event of a breach of the Programming Agreement. *Id.* Presently before the court are defendant's motion for judgment on the pleadings (**ECF No. 32**), plaintiff's opposition thereto (**ECF No. 38**), and defendant's reply (**ECF No. 42**).

Defendant urges the Court to dismiss plaintiff's complaint, arguing that plaintiff is not legally entitled to the return of the $2,000,000 consideration for the Option Agreement because the clauses conditioning defendant's retention of the consideration on its performance under the Programming Agreement are void and unenforceable under Puerto Rico law. **ECF No. 32** at 2, 8–11.

After a review of the parties' submissions and the applicable law, the court **DENIES** defendant's motion for judgment on the pleadings (**ECF No. 32**).

## I. Factual Background

The Court derives the following factual background from plaintiff's complaint

1. Plaintiff attached the following five (5) exhibits to its complaint: the Programming Agreement (**ECF No. 1–2**); the Option Agreement (**ECF No. 1–3**); a February 11, 2009 letter from Mega to Aerco (**ECF No. 1–4**); a July 20, 2009 letter from Mega to Aerco (**ECF No. 1–5**); and a November 23, 2009 termination letter from Mega to Aerco (**ECF No. 1–6**).

2. The Programming Agreement stated the following regarding the retransmission fees: "In consideration for the provision of the Pro-

(**ECF No. 1**) and all materials attached and fairly incorporated therein.[1] *Gagliardi v. Sullivan,* 513 F.3d 301, 305–06 (1st Cir.2008) (noting that in considering a Rule 12(c) motion, courts "may augment the facts in the complaint by reference to (i) documents annexed [to the complaint] or fairly incorporated into it, and (ii) matters susceptible to judicial notice") (citations and internal quotations omitted); *see* Fed.R.Civ.P. 12(d).

On or about April 22, 2008, the parties executed the Programming Agreement that stipulated the terms and conditions under which Mega would provide Aerco with Spanish-language programming. **ECF No. 1** at ¶ 5; **ECF No. 1–2**. Mega would do so by retransmitting the content of WSBS Channel 22 ("Mega–TV" or "Mega–TV Programming") to be aired on Aerco-owned WSJU–TV Channel 30 ("Channel 30") in the San Juan metropolitan area. **ECF No. 1–2** at 2. The Programming Agreement became effective on August 1, 2008 for a term of 24 months, ending on July 31, 2010. *Id.* at 3. Upon the effective date of the Programming Agreement, Aerco would broadcast Mega–TV during the Agreement's term in exchange for certain retransmission fees that Mega would pay to Aerco.[2] *Id.* at 2, 20. The Programming Agreement also placed specific obligations on Aerco as conditions of receiving Mega–TV.[3] *Id.* at 2–4, 6, 9, 11–12.

gramming, Mega and Licensee [Aerco] agree upon the following fee schedule: $7,000 per calendar month plus the duly evidenced electricity expense of Aerco's Aguas Buenas site." **ECF No. 1–2** at 20.

3. Plaintiff identifies the following salient obligations placed on defendant during the term of the Programming Agreement:

(a) Defendant would retain full authority and power over the policies, programming, and operations of Channel 30, including the

Article 7.1.1 of the Programming Agreement provided that either party, at its discretion, could terminate the Agreement at any time (i) after the breach of any representation, warranty, or covenant made in the Agreement; or (ii) after a party's failure to perform any material obligation in the Agreement that was either not cured within 30 days after receiving written notice of said failure from the other party or as to which the party had not begun, within 30 days, reasonable steps to cure. *Id.* at 10; *see* **ECF No. 1** at ¶ 6(k).

Contemporaneous with the execution of the Programming Agreement, the parties executed the Option Agreement. **ECF No. 1** at ¶ 7; **ECF No. 1–3.** The Option Agreement provided Mega with both an exclusive option to purchase certain assets owned by Aerco (the "Option") and a period of exclusivity during which Mega could exercise the Option (the "Exclusivity Period"). **ECF No. 1–3** at 1. The Option assets included Aerco's FCC License; all equipment for transmission of broadcasts used in the operation of Channel 30; the

hardware and software used in the operation of Channel 30; and the transmitter of digital equipment. *Id.* at 12. The Option Agreement also contemplated an Additional Option. *See id.* at 2, 3. The "Additional Option" clause stated that the eponymous option was a "mobile truck unit used in the operation of the Station." *Id.* at 3.

Section 1 of the Option Agreement, titled "EXCLUSIVITY; OPTION TO PURCHASE ASSETS," stipulated that Aerco would "cause its affiliates, directors, officers, employees, stockholders, representatives and agents not to, directly or indirectly, solicit or entertain" any transaction involving Channel 30 or related assets. *Id.* Aerco agreed to these restraints. *Id.* This Exclusivity Period began on April 22, 2008 and ended on August 1, 2008. *Id.* The Option's term was two years, beginning on August 1, 2008 and expiring on July 31, 2010. *Id.*

Additionally, Article 1.3 of the Option Agreement, the "Method of Exercise" clause, prescribed the method by which Mega could exercise the Option. *Id.* Specifically, Mega could exercise the Option at

decision whether to preempt any programming; (ii) employ and be responsible for all employees used to transmit Mega–TV.

(b) Defendant would be responsible for all capital expenses incurred in making replacements or repairs to the equipment and facilities used in producing Mega–TV.

(c) Defendant would have a 5kW digital transmitter, a 500 watt digital transmitter, and an antenna.

(d) Defendant would comply with FCC rules and regulations with respect to its ability to broadcast digitally.

(e) Defendant would make two minutes per hour available during branded Mega–TV programming for commercial or other announcements ("Avails"), the time for which would be provided in one-minute increments, evenly distributed throughout each hour and in 30–second increments, for each paid program aired during the Mega–TV schedule. Defendant or third parties iden-

tified by defendant would exercise the avails. All other commercial advertising spots were reserved exclusively for the use or disposal of plaintiff or third parties identified by plaintiff.

(f) Defendant would insert its authorized Avails only in the positions and at the times which plaintiff designated and without interruption of any Mega–TV program.

(g) Defendant expressly agreed that its right to preempt any Mega–TV programming would not be done arbitrarily or for defendant's commercial advantage.

(h) In the event that defendant exercised non-material preemption by a measure of more than five hours of Mega–TV programming and announcement over any consecutive 30–day period, plaintiff would be entitled, at its sole discretion, to terminate the Programming Agreement without further obligation to defendant and pursue all additional legal remedies available to it.

its sole discretion, at any time during the Option term, by delivering written notice to Aerco communicating its election to exercise the Option. *Id.* The "Additional Option" clause proscribed the same method and further stipulated that if Mega chose to exercise the Additional Option "at its sole discretion," it had to pay $200,000 to Aerco in either a lump sum or in monthly installments. *Id.*

In exchange for these rights and as additional consideration for entering into the Programming Agreement, the Option Agreement stipulated two payments totaling $2,000,000: $1,000,000 as consideration for the Option [4] and $1,000,000 as consideration for the Exclusivity Period (collectively the "Exclusivity and Option Payments"). *Id.* at 1–2. The Option Agreement expressly provided that the Exclusivity and Option Payments were generally non-refundable, but would be refundable to Mega if Aerco breached either the Option Agreement or the Programming Agreement.[5] *Id.* at 1, 3. The Option Agreement was silent as to whether the return of the Exclusivity or Option Payments would terminate the contract. *See id.*

On February 11, 2009, Mega sent Aerco a letter that described Aerco's alleged breaches of the Programming Agreement and failure to perform in accordance with the terms of the same. **ECF No. 1–4.** Specifically, Mega informed Aerco of the following breaches, among others: (i) Channel 30 was frequently off the air (i.e., Channel 30 frequently experienced "outages"); (ii) Channel 30's signal was often weak, fuzzy, or not viewable; (iii) Aerco's employees, over whom it maintained sole control, were insubordinate, unreliable, unsupervised and generally incapable of performing their duties, leading to the Mega–TV Programming being aired at incorrect times or not at all; (iv) Aerco's overall lack of responsiveness was resulting in the unprofessional and untimely broadcast of the Mega–TV Programming; and (v) Aerco was wrongfully and unilaterally preempting Mega's commercial spots. **ECF No. 1** at ¶ 19. The letter expressly stated that Aerco's acts and omissions caused Mega to suffer both monetary damages and damages to its reputation and good will. **ECF No. 1–4** at 2–4, 6. Accordingly, Mega demanded that Aerco immediately resolve all

**ECF No. 1** at ¶ 6.

4. The Option Payment also served as consideration for the Additional Option. **ECF No. 1–3** at 3.

5. With regard to the Exclusivity Payment, the Option Agreement provided, "[S]hould Aerco breach this Agreement or the Programming Agreement, the Exclusivity Payment shall be refunded to Mega promptly upon its request of such refund from Aerco." **ECF No. 1–3** at 1. The "Return of Option Payment" clause stipulated the following:

> [T]he Option Payment shall be refundable to Mega[ ] within thirty (30) calendar days of the occurrence of any of the following events: (a) The FCC License is materially impaired, cancelled or revoked or otherwise rendered unusable other than through any act of MEGA; (b) AERCO breaches this

Agreement or the Programming Agreement or refuses to transmit the Programming when requested to do so by MEGA; (c) AERCO is unable to enter into an assignable lease in favor of MEGA or its designees for a transmitter site prior to July 31, 2010, on terms and conditions customary for transactions of that type; (d) the FCC License suffers a material decline in value at any time prior to July 31, 2010 or any third party makes a claim against said License that may reasonably be expected to result in an encumbrance being imposed on such License ...; (e) AERCO files a petition for bankruptcy or for reorganization or assigns for the benefit of its creditors, or appointment of a receiver, trustee, liquidator or custodian for all or a substantial part of its property ...; or (f) The FCC Consent is not granted by the FCC for any reason attributable directly or indirectly to acts or omissions of AERCO.

of its deficiencies and requested that Aerco respond to its letter in writing. *Id.* at 6. Aerco never responded. **ECF No. 1 at ¶ 23.**

Subsequently, on July 20, 2009, Mega sent another letter to Aerco, detailing Aerco's alleged ongoing and additional breaches of the Programming Agreement. **ECF No. 1-5.** As examples of the breaches listed in its July 20, 2009 letter, Mega specifically alleges the following:

(i) Channel 30's continued outages, signal problems, audio problems, and overall poor transmission;

(ii) that Channel 30's substandard broadcasts had resulted in a stream of advertiser complaints and cancelled advertisements;

(iii) that Defendant's failure to transmit digitally (as called for by the Programming Agreement) constitutes a material breach of the Programming Agreement;

(iv) that Channel 30's failure/inability to operate at full power (as called for by the Programming Agreement) constitutes a breach of the Programming Agreement;

(v) that the Defendant was required to make all of the repairs or replacements so as to enable Channel 30 to operate at full power; and

(vi) that the Defendant's back-up generators were deficient and unreliable, thereby leading to a commercially unreasonable number of outages.

**ECF No. 1 at ¶ 25.** As in its prior letter, Mega stated that Aerco's breaches were causing it to suffer substantial monetary damages and damages to its reputation and good will. **ECF No. 1-5 at 3-4.** Moreover, Mega again demanded that defendant respond in writing within 7 days, providing a detailed action plan addressing the rectification of each problem specified in the February 11, 2009 and July 20, 2009 letters. *Id.* at 5. However, Aerco did not respond. **ECF No. 1 at ¶ 29.**

On November 29, 2009, Mega hand-delivered a letter to Aerco, communicating that it was terminating the Programming Agreement because of Aerco's uncured and continuing breaches of the Programming Agreement. **ECF No. 1-6 at 3.** Mega further demanded that Aerco refund the Exclusivity and Option Payments within 30 days as stipulated in the Option Agreement.[6] *Id.* Aerco has refused to refund the payments as requested. **ECF No.1 ¶ 32.**

On April 4, 2010, Mega filed suit against Aerco pursuant to this Court's diversity jurisdiction, alleging that Aerco breached the terms of the Programming Agreement[7] and the Option Agreement. *Id.* at

*Id.* at 3.

6. The relevant section of the letter reads, "Mega demands the (i) prompt refund of the Exclusivity Payment pursuant to the penultimate sentence of Section 1.1 of the Exclusivity Agreement and (ii) refund within thirty (30) calendar days from the date hereof the Option Payment pursuant to Section 1.5(b) of the Exclusivity Agreement." **ECF No. 1-6 at 3.**

7. Plaintiff alleges the following breaches by defendant, while indicating that the list is not an exhaustive recounting of defendant's breaches:

(a) failing to broadcast the Mega–TV Programming in a commercially reasonable

fashion, as demonstrated by the repeated outages, audio and signal problems which Channel 30 experienced throughout the Term; (b) failing to employ and be responsible for all employees necessary to properly transmit the Mega–TV Programming and operate Channel 30; (c) failing to assume all capital expenses incurred in making repairs or replacements to the facilities and equipment used in producing the Mega–TV Programming properly; (d) failing to maintain a digital transmitter of 5kW, a digital transmitter of 500 watts and an antenna; (e) failing to ensure that Channel 30 would be compliant with the rules and regulations of the FCC with respect to its ability to

¶¶ 34, 35. Mega avers that Aerco has breached the Option Agreement by failing to timely return the Exclusivity and Option Payments following the alleged breach of the Programming Agreement. *Id.* at ¶ 35. Mega claims that Aerco's breaches of the Programming and Option Agreements have caused, and continue to cause, Mega to suffer actual and substantial monetary damages. *Id.* at ¶ 37. As such, plaintiff requests actual and compensatory damages, together with all pre-judgment and postjudgment interest. *Id.*

On August 12, 2011, Aerco submitted its motion for judgment on the pleadings[8] pursuant to Fed.R.Civ.P. 12(c). **ECF No. 32.** Aerco urges the court to dismiss Mega's complaint because Mega is not legally entitled to the return of the Exclusivity and Option Payments contained in the Option Agreement. *Id.* at 2. Specifically, Aerco argues the clauses, conditioning its right to keep the Exclusivity and Option Payments on its performance under the Programming Agreement, are void and unenforceable under Puerto Rico law. *Id.* To support its position, Aerco advances two arguments.

The first is a theory based on *Matos Lorenzo v. Rivera Tirado*, 181 D.P.R. 835 (2011) (certified translation available at **ECF No. 56–3**), a recent judgment from the Supreme Court of Puerto Rico ruling on a claim for breach of an option contract. **ECF No. 32** at 7–8, 10. In that case, defendant avers, the Supreme Court of Puerto Rico held that the exercise of an option contract is of a unilateral nature, solely under the control of the optionee. *Id.* at 8. Defendant interprets *Matos Lorenzo* to mean that the exercise of an option cannot depend upon events that require the optionor's action—the exercise can depend solely on the acts of the optionee. *Id.* Accordingly, Aerco argues that the clauses specifically requiring Aerco to refund the Exclusivity and Option Payments upon its breach of the Programming Agreement are invalid because they frustrate Mega's unilateral right to exercise the option. *Id.* at 10.

Aerco's second argument is that the clause requiring refund of the Exclusivity Payment upon its breach of the Programming Agreement is patently unreasonable as a matter of law. *Id.* at 10–11. Aerco argues as much because the return of the Exclusivity Payment was subject to Aerco's performance of the Programming Agreement that was not even in effect at the time and would still be in effect two years after the Exclusivity Period had ended. *Id.*

On September 9, 2011, Mega opposed Aerco's motion, arguing that under Puerto

broadcast digitally; (f) arbitrarily, and to its commercial advantage, preempting Mega–TV Programming; (g) exercising non-material preemption by a measure of more than five (5) hours of Mega–TV Programming and announcements over a consecutive thirty (30) day period at Channel 30; and (h) failing to timely cure the material breaches when requested in writing by Plaintiff to do so.
**ECF No. 1.** at ¶ 34.

8. Defendant fails to substantively contest plaintiff's allegations of breach of the Programming Agreement. The only mention of said claim is on the final page of defendant's motion, where defendant writes, "[e]ven assuming that Aerco breached the Programming Agreement, which is denied, the clause providing for the refund of the Exclusivity and Option Payments is void and unenforceable under Puerto Rico law." **ECF No. 32** at 11. Such an undeveloped, conclusory argument may be deemed waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). However, out of an abundance of caution, the court addresses plaintiff's claims of breach of the Programming Agreement in its analysis.

Rico law, imposing conditions outside the control of the optionee does not void an option contract. **ECF No. 38** at 10–12. Thus, Mega argues that the conditions, requiring Aerco to return the Exclusivity and Option Payments if it breached the Programming Agreement, are valid. **ECF No. 38** at 10–12. Mega further argues that, even if the Option Agreement is void, Aerco must still refund Mega the Exclusivity and Option Payments because Aerco would have no right to retain the payments. *Id.* at 12–13.

Mega undermines Aerco's reliance on *Matos Lorenzo,* arguing that it is not an "opinion" of the Supreme Court of Puerto Rico, but rather a judgment from the Supreme Court with a concurring opinion.[9] As such, the judgment has no binding precedential value in this case. *Id.* at 4–6, 8–10. Moreover, Mega argues that the holding in *Matos Lorenzo* is not applicable here because the issues in each case are distinguishable. *Id.* at 9. Instead, Mega urges the court to decide the case solely under Puerto Rico's principle of freedom of contract. *Id.* Further, Mega argues that because Aerco voluntarily and willingly entered the Option Agreement that expressly provided for a refund of the Exclusivity Payment upon its breach of the Programming Agreement, Aerco cannot now claim that the clause is unreasonable. *Id.* at 12.

In its reply, Aerco states that *Matos Lorenzo* is binding because it reflects the prevailing view of the Supreme Court of Puerto Rico or, at the very least, is persuasive precedent because it indicates how the Supreme Court would resolve the dispute here. **ECF No. 42.** Aerco also argues it is not required to return Exclusivi-

ty and Option Payments because it has not interfered with Mega's option rights. *Id.* at 5. Aerco avers that, even if the court declared the entire Option Agreement invalid, under the doctrine of unjust enrichment, Mega would still be required to compensate Aerco for the period it kept the station off the market so that plaintiff could make arrangements to purchase it. *Id.*

## II. Standard for Judgment on the Pleadings

The court decides a Rule 12(c) motion under the same standard it applies to Rule 12(b)(6) motions to dismiss. *Marrero–Gutiérrez v. Molina,* 491 F.3d 1, 5 (1st Cir. 2007). Accordingly, to survive a Rule 12(c) motion, the plaintiff must plead enough facts to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In evaluating the complaint, the Court accepts as true all well-pleaded facts and draws all reasonable inferences in the plaintiff's favor. *Parker v. Hurley,* 514 F.3d 87, 90 (1st Cir.2008). However, "the tenet that a Court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader

9. The breakdown of the Supreme Court of Puerto Rico's decision was as follows: three justices joined the written concurring opinion; one justice concurred in the judgment without a written opinion. Two justices dissented without a written opinion. Finally, one justice did not participate in the decision.

is entitled to relief.'" *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

When considering a motion to dismiss, the Court must undertake a two-step process under the current context-based "plausibility" standard established by *Twombly* and *Iqbal.* "Context based" means that a plaintiff must allege facts that comply with the basic elements of the cause of action. *See Iqbal,* 129 S.Ct. at 1949–50. First, the Court must "accept as true all of the factual allegations contained in a complaint[,]" and discard all of the legal conclusions, conclusory statements and factually threadbare recitals of the elements of a cause of action. *Maldonado v. Fontanes,* 568 F.3d 263, 268 (1st Cir. 2009) (quoting *Iqbal,* 129 S.Ct. at 1949 (internal quotation omitted)).

Under the second step of the inquiry, the Court must determine whether all assertions remaining after undertaking the first step of the inquiry, taken as a whole, "state a facially plausible claim for relief." *Ocasio–Hernández v. Fortuño–Burset,* 640 F.3d 1, 10–11 (1st Cir.2011). This second step is "context-specific" and requires that the court draw from its own "judicial experience and common sense" to determine whether a plaintiff has stated a claim upon which relief may be granted, or whether dismissal under Rule 12(b)(6) is appropriate. *Maldonado,* 568 F.3d at 268. This "plausibility standard is not akin to a 'probability requirement,' [for] it asks for more than a sheer possibility that a defendant has acted unlawfully." *Sepúlveda–Villarini v. Dept. of Educ. of P.R.,* 628 F.3d 25, 29 (1st Cir.2010) (quoting *Iqbal,* 129 S.Ct. at 1949); *see also Marrero Gutiérrez v. Molina,* 447 F.Supp.2d 168, 172 (D.P.R.2006) ("[T]o survive a Rule 12(b)(6) motion, plaintiffs must present 'factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable

legal theory.'") (quoting *Romero–Barceló v. Hernández–Agosto,* 75 F.3d 23, 28 n. 2 (1st Cir.1996)).

## III. Applicable Law

■ The substantive law of Puerto Rico governs the instant diversity action based on Puerto Rico contract law. *P.C.M.E. Commercial, S.E. v. PACE Membership Warehouse,* 952 F.Supp. 84, 88 (D.P.R. 1997); *see Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When faced with a state law question that the state's highest court has not clearly addressed, a federal court "may certify a state law issue to the state's highest court, or undertake its prediction 'when the course [the] state courts would take is reasonably clear.'" *VanHaaren v. State Farm Mut. Auto. Ins. Co.,* 989 F.2d 1, 2 (1st Cir.1993) (quoting *Porter v. Nutter,* 913 F.2d 37, 41 n. 4 (1st Cir.1990)). Although there is no clearly controlling precedent on this specific issue, the court finds that Puerto Rico law and its jurisprudence has provided a sufficiently clear path for the court to follow. *See Acosta–Mestre v. Hilton Int'l of P.R.,* 156 F.3d 49, 54 (1st Cir.1998) ("While there is no blackletter precedent in Puerto Rico that controls here, we find relatively clear the course that the courts of that jurisdiction would take.").

### A. Breach of Contract Under Puerto Rico Law

■ Under Puerto Rico law, the elements of a cause of action for breach of contract are (1) a valid contract, (2) a breach by one of the parties to the contract; and (3) resulting damages. *T.C. Invs., Corp. v. Becker,* 733 F.Supp.2d 266, 278 (D.P.R.2010); *F.C. Imps., Inc. v. First Nat'l Bank of Boston, N.A.,* 816 F.Supp. 78, 93 (D.P.R.1993) (citing *Unisys P.R., Inc. v. Ramallo Bros. Printing, Inc.,* 1991

J.T.S. 69, 128 D.P.R. 842, 1991 WL 735351 (P.R.1991)).

■ Puerto Rico law stipulates three requirements for a valid contract: (1) the contracting parties' consent; (2) a definitive, legal object of the contract; and (3) consideration. *Citibank Global Mkts., Inc. v. Santana*, 573 F.3d 17, 24 (1st Cir.2009) (citing P.R. Laws Ann. tit. 31, § 3391; *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139 (1996)); *Bianchi–Montana v. Crucci–Silva*, 720 F.Supp.2d 159, 164 (D.P.R.2010). Consent requires that the parties agree to be bound by the contract. *See Marrero–García v. Irizarry*, 33 F.3d 117, 122 (1st Cir.1994); *see also* P.R. Laws Ann. tit. 31, § 3401 ("Consent is shown by the concurrence of the offer and acceptance of the thing and the cause which are to constitute the contract."). Moreover, there must be "a meeting of the minds as to the terms agreed upon." *K–Mart Corp. v. Davis*, 756 F.Supp. 62, 66 (D.P.R.1991).

### B. Option Contracts Under Puerto Rico Law

Because the Puerto Rico Civil Code is silent on option contracts, the Supreme Court has specified the contours of the law regarding the same. *P.D.C.M. Assocs., S.E. v. Najul Bez*, 174 D.P.R. 716, 724, 2008 WL 3850078 (2008) (certified translation available at **ECF No. 56–4**); *Rosa Valentín v. Vázquez Lozada*, 3 P.R. Offic. Trans. 1115, at *5, 103 D.P.R. 796 (1975). The Supreme Court has defined an option contract as an agreement by which a party (the grantor, promisor, or optionor) grants to the other (the optionee), for a fixed term and under certain conditions, the exclusive power of deciding whether to execute a principal contract. *Mayagüez Hilton Corp. v. Betancourt*, 156 D.P.R. 234, 246 (2002) (citing *Atocha Tom McAn, Inc. v. Registrar of Prop. of Ponce*, 23 P.R. Offic. Trans. 497, at *7, 1989 WL 550996 (1989)).

Black's Law Dictionary defines an option contract as "a contractual obligation to keep an offer open for a specified period, so that the offeror cannot revoke the offer during that period." *Black's Law Dictionary* 1203 (9th ed. 2009); *see also Vélez Santiago v. United States*, 642 F.Supp. 267, 269 (D.P.R.1986) (defining an option contract per *Black's Law Dictionary* ). In developing this definition, the Supreme Court has established the following as essential elements of an option contract: (1) the optionee's exclusive power to decide at its sole discretion whether to exercise the option without any other obligation on the optionee's part; (2) the optionee's exclusive right to the option; (3) a specific term for the option; and (4) the conditions therein reflect only the optionee's will. *Rosa Valentín*, 3 P.R. Offic. Trans. 1115, at *6, 103 D.P.R. at 807–08; *P.D.C.M. Assocs.*, 174 D.P.R. at 724; *Atocha Thom McAn, Inc.*, 23 P.R. Offic. Trans. 497, at *7, 123 D.P.R. at 586–88; *see also Irizarry López v. García Cámara*, 155 D.P.R. 713, 722–23, 2001 WL 1555664 (2001) (citing *Rosa Valentín*, 103 D.P.R. 796).

■ Further, the Supreme Court acknowledged that parties may establish that a right of option will be subject to compliance with certain conditions. *Zeta Enters. v. Puerto Rico*, 145 D.P.R. 1, 10 (1998) (considering the effect of two conditions on an option) (certified translation available at **ECF No. 56–2**). Thus, although a "typical option implies that the holder of the right has the power to decide" whether to exercise the option, the "provisions [of the option contract may] qualify the scope of the option, in accordance with the will of the contracting parties." *Id.*

■ Nevertheless, the Supreme Court has acknowledged that option contracts are a distinct breed and established specific, sometimes limiting, obligations on its

parties that circumscribe their ability to impose conditions. Significantly, the optionor has the obligation not to thwart or frustrate the right enjoyed by the optionee. *P.D.C.M. Assocs.*, 174 D.P.R. at 724; *Mayagüez*, 156 D.P.R. at 250.

Moreover, the Supreme Court has consistently recognized that the general rules regarding contracts and obligations are applicable to option contracts. *Rosa Valentín*, 3 P.R. Offic. Trans. 1115, at *4, 103 D.P.R. at 803–04; *see Álvarez de Choudens v. Rivera Vázquez*, 165 D.P.R. 1, 17–18 (2005) (certified translation available at **ECF No. 57–1**). Consequently, the general principle of freedom to contract, under which contracting parties can establish the terms, clauses, and conditions that they deem appropriate, provided they are not contrary to law, morals, or public order, applies here. *Álvarez de Choudens*, 165 D.P.R. at 17.

■ Similarly, once the parties consent to the terms of the option contract, they are bound by the terms, which becomes the law between the parties. *Constructora Bauzá, Inc. v. García López*, 1991 P.R.-Eng. 735,859, at *3, 1991 WL 735859 (1991) (citing *Cervecería Corona v. Commonwealth Ins. Co.*, 115 D.P.R. 345, 15 P.R. Offic. Trans. 455 (1984)); *see* P.R. Laws Ann. tit. 31, § 2994.

■ In addition, Articles 1233 and 1234 of the Puerto Rico Civil Code govern the interpretation of a contract. *See Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 109 (1st Cir.2001). Puerto Rico law provides: "If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed. If the words should appear contrary to the evident intention of the contracting parties, the intention shall prevail." P.R. Laws Ann. tit. 31, § 3471. Thus, courts are called upon to enforce the literal sense of a contract unless the language is somehow contrary to the parties' intent. *Hopgood v. Merrill Lynch*, 839 F.Supp. 98, 104 (D.P.R.1993) (citing *Mariana Indus., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 72, 14 P.R. Offic. Trans 86 (1983)). Puerto Rico law also instructs the court that "attention must principally be paid to their acts, contemporaneous and subsequent to the contract." P.R. Laws Ann. tit. 31, § 3472. The court should also "take into consideration who the contracting parties are, as well as there experience and expertise with the subject matter of the contract." *Unisys of P.R. v. Ramallo Bros. Printing, Inc.*, P.R. Offic. Trans., 128 D.P.R. 842, 853, 1991 WL 735351 (1993).

The court now applies the precepts discussed above to the instant case.

## IV. Discussion

### A. Breach of Programming Agreement

To establish a prima facie breach of contract claim as to the Programming Agreement, Mega must successfully allege that (1) the Programming Agreement was a valid contract, (2) Aerco breached the Programming Agreement; and (3) Mega suffered resulting damages. *T.C. Invs., Corp.*, 733 F.Supp.2d at 278. Because Mega has indeed alleged these requirements, Aerco's motion for judgment on the pleadings (**ECF No. 32**) as to the Programming Agreement is **DENIED**.

#### 1. Validity

■ First, Mega has alleged that the Programming Agreement is a valid contract, which requires (1) consent, (2) a legal object of the contract, and (3) consideration. *See Citibank Global Mkts., Inc.*, 573 F.3d at 24. The Programming Agreement and Mega's complaint evince the parties' consent. Mega and Aerco, two so-

phisticated parties represented by counsel, delineated and agreed to the terms of the Programming Agreement. There was a meeting of the minds as to these terms. Additionally, the Programming Agreement clearly identified the parties' respective obligations. *See* P.R. Laws. Ann. tit. 31, § 3421 (liberally defining the objects of contracts as "all things, even future ones, which are not out of the commerce of man"). Finally, the monthly retransmission fees that Mega agreed to pay to Aerco served as the Programing Agreement's valid consideration for Aerco's transmission of Mega–TV. *See P.R. Elec. Power Auth. v. Action Refund,* 483 F.Supp.2d 153, 158 (D.P.R.2007) ("Cause [for the obligation] encompasses almost any motivation a person might have for entering into a binding agreement"); *see also* P.R. Laws Ann. tit. 31, § 3431 (defining sufficient consideration as the "presentation or promise of a thing or services by the other party"). Accordingly, Mega has alleged the elements of a valid contract.

## 2. Breach

■ Second, Mega has indeed alleged that Aerco breached the Programming Agreement. Mega establishes breach in its complaint, listing among other deficiencies, that Aerco (i) failed to broadcast the Mega–TV Programming in a commercially reasonable fashion (breach of Article 1.6 of the Programming Agreement); (ii) failed to employ and be responsible for all employees necessary to properly transmit the Mega–TV Programming and operate Channel 30 (Articles 3.1, 4); (iii) failed to maintain a digital transmitter of 5kW, a digital transmitter of 500 watts and an antenna (Article 6.1.11); and (iv) failed to ensure Channel 30's compliance with the FCC's rules and regulations with respect to its ability to broadcast digitally (Articles 6.1.1, 6.1.9). The three letters Mega sent to Aerco support Mega's allegations of

breach. In these letters, Mega notified Aerco of its alleged breaches and provided it an opportunity to cure on two occasions. Mega argues, and Aerco does not dispute, that Aerco never cured its deficiencies.

Thus, Mega has sufficiently alleged that Aerco has breached the Programming Agreement.

## 3. Damages

■ Finally, Mega, through its pleadings and through the three letters sent to Aerco, has alleged that Aerco's breach of the Programming Agreement resulted in damages to Mega, entitling Mega to relief from this court. Such damages include monetary damages and damages to its reputation and good will. In sum, Mega has clearly alleged sufficient facts in the complaint to establish a breach of contract claim. Moreover, Aerco fails to substantively address Mega's claim for breach of the Programming Agreement. The only mention of said claim is on the final page of the motion, where Aerco writes, "[e]ven assuming that Aerco breached the Programming Agreement, which is denied . . ." **ECF No. 32** at 11.

Thus, plaintiff has set forth a prima facie breach of contract claim as to the Programming Agreement and the Court must **DENY** defendant's motion for judgment on the pleadings (**ECF No. 32**) as to this claim.

## B. Breach of the Option Agreement

The court must now determine whether plaintiff has properly pled that defendant has breached the agreement. To do so, plaintiff must allege that (1) the Option Agreement was a valid contract; (2) Aerco breached the Option Agreement; and (3) Mega suffered resulting damages. *T.C. Invs., Corp.,* 733 F.Supp.2d at 278.

## 1. Validity of the Option Agreement

Mega must establish the following for the Court to find that the Option Agreement is a valid option contract: (1) that Mega had the unilateral power to decide whether to exercise the option without any obligation to do so on Mega's part; (2) that Mega had the exclusive right to the option; (3) that there was a specific term for the option; and (4) that the Option Agreement did not contain any conditions that did not reflect Mega's will.[10] *See Rosa Valentin,* 3 P.R. Offic. Trans. 1115, at *6, 103 D.P.R. at 807–08. The Court finds that the Option Agreement satisfies these four elements.

### a. Exclusive Power to Exercise the Option

■■■ Mega has sufficiently alleged that Aerco granted Mega the exclusive power to unilaterally decide whether to exercise the Option in the Option Agreement. Article 1.3, the "Method of Exercise" clause stipulated the means by which Mega could exercise the option. **ECF No. 1–3 at 2.** Specifically, Mega could exercise the Option "in its sole discretion at any time during the [Option] Term" by sending written notice to Aerco communicating its decision to exercise the Option. *Id.* The "Method of Exercise" clause placed no additional conditions on Mega's election to exercise the option. *See id.* .

The "Additional Option" clause further evinces Mega's exclusive power to exercise the option. The clause provided the same means by which Mega had to exercise the Additional Option, significantly "in its sole discretion at any time during the [Option] Term." *Id.* at 3. The "Additional Option" clause further stipulated that if Mega chose to exercise the Additional Option "at its sole discretion," it had to pay $200,000 to Aerco in either a lump sum or in monthly installments. *Id.*

Moreover, related language in the Agreement reflects Mega's exclusive power to exercise the Option. For example, Article 1.4 states "[a]ssuming the timely exercise of the Option by MEGA." This language contemplates only Mega exercising the Option and manifests the parties' intent for such an exclusive exercise. Therefore, the Court concludes that Aerco indeed granted Mega the exclusive power to exercise the Option.

### b. Exclusive Right to the Option

■■■ The exclusive nature of Mega's right to the option is also reflected in the Option Agreement. The Agreement contemplates Mega acquiring "from Aerco ... an exclusive option to purchase certain assets of the Station." **ECF No. 1–3 at 1.** Reinforcing Mega's exclusive right to the option is Section 1 of the Option Agreement, titled "EXCLUSIVITY; OPTION TO PURCHASE ASSETS." *Id.* Within this Section, the "Exclusivity" clause stipulated that Aerco agreed to refrain from directly or indirectly soliciting or entertaining any transaction involving Channel 30 or assets related to Channel 30. *Id.* Aerco agreed to cause all related individuals and affiliates to the adhere to the same restraints. *Id.* Moreover, Article 1.2 provided that "AERCO hereby sells and grants MEGA an exclusive option to purchase the Option Assets ... as well as the exclusive Option to exercise the Additional Option." *Id.* at 2. Further, the "Additional Option" clause echoed the language in Article 1.2, stipulating that "AERCO hereby sells and grants MEGA an exclusive option to purchase" the Additional Option. *Id.* at 3. Accordingly, the Court finds that the

---

**10.** The Court notes that this element overlaps with the first. As such, the analysis for each may overlap.

Option Agreement granted Mega an exclusive right to the Option.

### c. Specific Term for the Option

■ The Option Agreement also provided a specified term in which Mega could elect to exercise the Option. The "Exclusivity" clause provided that April 22, 2008 through August 1, 2008 was the Exclusivity Period in which Mega would have the exclusive right to the Option. *Id.* at 1. Additionally, Article 1.2 stipulated that the "term of the Option [would begin on August 1, 2008 and] will expire on July 31, 2010." *Id.* at 2. Accordingly, the Option Agreement satisfies the third requirement of a valid option contract by providing a specific term for the Option.

### d. All Conditions Reflect the Optionee's Will

■ The final element precludes the Option Agreement from containing any conditions that would inhibit Mega's exclusive discretion to unilaterally elect to exercise the Option. *Rosa Valentín,* 3 P.R. Offic. Trans. 1115, at *6, 103 D.P.R. at 807–08; *see P.D.C.M. Assocs.,* 174 D.P.R. at 724; *Mayaguez,* 156 D.P.R. at 250. Aerco's primary argument in its motion for judgment on the pleadings pertains directly to this element. Aerco argues that the clauses requiring Aerco to return the Option Payment rendered Mega's decision to

exercise the option dependent upon external conditions that were not subject to its discretion, thus invalidating the Option Agreement. Aerco bases this argument on *Matos Lorenzo v. Rivera Tirado,* 181 D.P.R. 835 (2011), a recent concurring opinion from the Supreme Court of Puerto Rico. **ECF No. 32** at 10; *see* **ECF No. 56–3.** Specifically, Aerco argues that "[b]y stating that the Exclusivity and Option Payments would be refundable to Mega if Aerco breached the Programming Agreement, the Exclusivity and Option Agreement was in fact subjecting Mega's exercise of the option to actions by Aerco beyond those allowed by the law in an option contract." *Id.*

Aerco urges the Court to apply the reasoning of *Matos Lorenzo* to this case. However, as mentioned above, the parties dispute the precedential value of *Matos Lorenzo.*[11] Notwithstanding, the court finds that *Matos Lorenzo* is distinguishable from the instant case.[12]

Rather than involving the active participation of the optionor, the contract before the Court contemplates the optionor refraining from activity, specifically from breaching an outside contract between the parties. Thus, whereas in *Matos Lorenzo* the optionor had to perform an act in order to allow the optionee to exercise the option, here the option contract was merely conditioned on the optionor not breach-

---

11. In its opposition, Mega argues that Aerco "mischaracterizes" *Matos Lorenzo* by failing to identify the case as a judgment with a concurring opinion. **ECF No. 38** at 3–4. Aerco's failure to do so, Mega argues, constitutes "an intentional attempt to induce this Court to error" and a "gross violation of defense counsel's duty of Candor to this Court." *Id.* at 5 (citing D.P.R. Civ. R. 83E; Model R. of Prof'l Conduct 3.3). While the Court recognizes that limited weight should be accorded to *Matos Lorenzo,* it does not find that defendant's reliance on this case amounts to a violation of counsel's duty of candor.

12. In *Matos Lorenzo,* the Supreme Court of Puerto Rico determined whether a clause subjecting the exercise of the option to the active participation of the optionor—as well as that of the optionee—was valid, or whether it frustrated the optionee's right to unilaterally exercise the option. 181 D.P.R. at 851. Specifically, the contract at issue in *Matos Lorenzo* required the optionor to sign the deed of sale for the optioned commercial property so that the optionees could effectively exercise their option. *Id.*

ing another concurrently executed contract.

This distinction between the two cases is further exhibited in the specific language of the option contracts in each case. In *Matos Lorenzo*, the pertinent language cited by the Supreme Court directly affected the ability of the optionee to exercise its option because it prevented the optionees from exercising their option until the optionor signed the deed of sale. *See id.* at 837, 850. As such, the clause deprived the optionees of their unilateral right to exercise their option. *See id.* at 850. Moreover, the clause expressly stated that the option contract would be void upon the optionor's failure to sign the deed. *Id.* at 837.

Here, the disputed clause requires the optionor to return the consideration to the optionee upon the occurrence of any of six listed events, including the optionor's breach of an outside contract between the parties. Unlike the clause in *Matos Lorenzo*, this clause did not prevent Mega from exercising its option. Rather, it delineated the conditions under which Mega might elect to not exercise the option before the termination of the Option Period. Thus, the decision to exercise the option remained exclusively Mega's. Under Puerto Rico law, such conditions in option contracts may be allowed. *See Zeta Enters.*, 145 D.P.R. at 10 (finding two conditions in an option contract valid because they reflected the will of the contracting parties).

A final distinction is the optionees' conduct in each case, specifically with regard to the exercise of their respective options. The optionees in *Matos Lorenzo* wanted to exercise their option and attempted to do just that. *Id.* at 837–38. However, because the optionors did not sign the deed before the expiration of the option term, as required by the option contract, the op-

tionees were prevented from exercising their option. *Id.* In the case at hand, the optionee did not elect to exercise its option, nor did it express a desire to do so. The only conduct on the optionee's part was its request for the return of the consideration. In light of the above, the Court finds that defendant's reliance solely upon *Matos Lorenzo* is misplaced.

Accordingly, the Court finds the Option Agreement is valid because the conditions therein reflect only Mega's will. *See Rosa Valentin*, 3 P.R. Offic. Trans. 1115, at *6, 103 D.P.R. at 807–08. As discussed above, the conditions provided under the "Method of Exercise" clause pertain only to Mega's conduct. Specifically, the clause provided that Mega could exercise the Option "in its sole discretion" by sending written notice to Aerco expressing its decision to do so. **ECF No. 1–3 at 2.** These same conditions, along with Mega paying $200,000 to Aerco, applied to Mega's exercise of the Additional Option. *Id.* at 3. Therefore, the "Method of Exercise Clause" left the exercise of the Option exclusively to Mega, thereby reflecting only Mega's will.

Additionally, the "Return of Option Payment" clause delineated the events upon which Mega could elect to not exercise the option before the expiration of the Option Period. *See id.* at 3. As such, the decision to exercise the option remained exclusively Mega's.

Applying the general rules of contracts to the Option Agreement, the Court finds that such rules support its determination that the Option Agreement is valid. *See Alvarez de Choudens*, 165 D.P.R. at 17; *Marina Indus., Inc.*, 114 D.P.R. at 72; *Rosa Valentin*, 3 P.R. Offic. Trans. 1115, at *4, 103 D.P.R. at 803–05. As sophisticated parties with expertise in the television programming industry, Mega and Aerco were fluent in the subject matter of the Option Agreement. *See Unisys of P.R.*,

128 D.P.R. at 853. Thus, the Court finds it significant that Aerco does not allege, nor do the filings suggest, that it was in any way pressed into signing the Option Agreement or raised any reservations about the terms therein failing to reflect industry practices. *See Ramírez, Segal & Látimer v. Rojo Rigual*, 23 P.R. Offic. Trans. 156, at *7, 123 D.P.R. at 176–77 (1989); *see also Unisys of P.R.*, 128 D.P.R. at 853 (writing that the "consent and the contract expressing such consent, enjoy a presumption of validity" absent error, violence, intimidation, or deceit) (citing P.R. Laws Ann. tit. 31, § 3474). Aerco was aware of the consequences of and accepted the conditions on the Exclusivity and Option Payments when it entered the Option Agreement, but executed the contract just the same. *See Rosa Valentín*, 3 P.R. Offic. Trans. 1115, at *9, 103 D.P.R. at 811–12 (holding that although the optionees did not accept the promise to sell and no obligation remained to the optionor, not even returning the premium optionees paid, the optionors had to return the premium because they had agreed to do so).

Accordingly, the Court finds that the Option Agreement is valid. The Court now turns to defendant's argument that the clauses requiring the Option and Exclusivity Payments are themselves invalid. *See id.* at *4, 103 D.P.R. at 803–05.

### d(1). Validity of Clause Requiring Return of the Option Payment

▮ Aerco argues that the "Return of Option Payment" clause is invalid because it frustrates Mega's unilateral right to exercise its option.[13] The Court disagrees and finds that the clause is valid because the language of the clause reflects the parties' intent. *See Hopgood*, 839 F.Supp. at 104.

The clause stipulated that if any of the six listed events occurred, Aerco was obligated to return to Option Payment. **ECF No. 1–3** at 3. Among the events were: Aerco's breach of either the Option or Programming Agreement; the material impairment of the FCC License; a material decline in the Licence's value; Aerco's filing for bankruptcy; and Aerco's inability to enter an assignable lease for a transmitter site before the option expired. *Id.* Mega and Aero, sophisticated business entities in the television programming industry, identified and agreed to these six specific events that triggered the exception to the Option Agreement's general rule that the Option Payment was non-refundable. *See Unisys of P.R.*, 128 D.P.R. at 853. All of these events pertain directly to the value of the Option assets Mega had agreed to purchase—the FCC license, the equipment, the hardware and software, and the transmitter. Mega and Aerco had the relevant expertise to determine that these events would render the Option assets undesirable to Mega and expressly listed them as such in the Option Agreement. *See id.*

Thus, the meaning of the clause—as read with Mega and Aerco's expertise in the Agreement's subject matter in mind—is clear. *See id.* Mega and Aerco agreed that these six events would trigger the return of the Option Payment and might cause Mega to elect not to exercise its option right. Accordingly, the decision to exercise remained exclusively Mega's.

Additionally, both Mega and Aerco were sophisticated business entities in the television programming industry, appeared represented by counsel, and agreed to this clause. As such, they were

---

**13.** Inasmuch as defendant relies on *Matos Lorenzo* as support for its argument regarding the validity of the individual clauses requiring the Exclusivity and Option Payments, the Court finds *Matos Lorenzo* equally inapplicable.

bound by the terms of the clause. The parties' agreement reflects their acceptance of the consequences of the conditions stated therein. *See Hopgood,* 839 F.Supp. at 107–08 (finding that plaintiff "was a sophisticated party negotiating an employment contract who knew or should have known the import of the contract that he signed"); *see also Ramírez, Segal & Látimer v. Rojo Rigual,* 23 P.R. Offic. Trans. 156, at *7, 123 D.P.R. at 176–77 (upholding an unfavorable contingent-fees agreement plaintiffs entered with defendants and then opposed where "the parties freely and voluntarily entered into a contract, fully aware of the obligations they assumed").

Accordingly, the Court finds that Aerco has failed to show that the clause requiring the return of the Option Payment is invalid.

### d(2). Validity of the Clause Return of the Exclusivity Payment

 Without citing any case law, Aerco argues that the clause requiring it to return the Exclusivity Payment upon its breach of the Programming Agreement is patently unreasonable as a matter of law. The Court is unconvinced by defendant's argument. As unwise as defendant's agreement to the Exclusivity Clause may have been, defendant agreed to the terms in executing the contract and was, therefore, bound by them. *See* P.R. Laws. Ann.

tit. 31, § 2994; *see also Hopgood,* 839 F.Supp. at 107 (holding that plaintiff "made a bad bargain, but that does not entitle him to have a court of law change the outcome of his bargain").

Further, the Exclusivity Payment served as additional consideration for Aerco's fulfillment of its obligations under the Programming Agreement.[14] Thus, in not refunding the Exclusivity Payment, Aerco would be retaining consideration for obligations that Mega avers that Aerco did not fulfill. *See Adamés Milan v. Centennial Commc'ns Corp.,* 500 F.Supp.2d 14, 21 (D.P.R.2007) (citing *Widener v. Arco Oil & Gas Co.,* 717 F.Supp. 1211, 1217 (N.D.Tex. 1989) for the proposition that "[a] party cannot be permitted to retain the benefits received under a contract and at the same time escape the obligations imposed by the contract").

Thus, the Court finds that Aerco has not shown that the clause requiring the return of the Exclusivity Payment is invalid as a matter of law.

### 2. Breach

 Mega alleges that Aerco breached the Option Agreement by failing to return the Exclusivity and Option Payments upon Mega's request following Aerco's alleged breach of the Programming Agreement. The refund of these payments were express contractual obligations placed on and agreed to by Aerco.[15] By allegedly refus-

---

14. The following analysis applies to the Option Payment because it also served as additional consideration for entering the Programming Agreement.

15. The Option Agreement provided, "should AERCO breach this Agreement or the Programming Agreement, the Exclusivity Payment shall be refunded to MEGA promptly upon its request of such refund from AERCO." **ECF No. 1–3** at 1. The "Return of Option Payment" clause stipulated the following:

[T]he Option Payment shall be refundable to Mega[ ] within thirty (30) calendar days of the occurrence of any of the following events: (a) The FCC License is materially impaired, cancelled or revoked or otherwise rendered unusable other than through any act of MEGA; (b) AERCO breaches this Agreement or the Programming Agreement or refuses to transmit the Programming when requested to do so by MEGA; (c) AERCO is unable to enter into an assignable lease in favor of MEGA or its designees for a transmitter site prior to July 31, 2010,

ing to refund the payments to Mega, as required by the Option Agreement, Aerco has arguably breached said contract. Further, the Court notes that Aerco does not dispute that it has refused to refund the Exclusivity and Option Payments. Its only argument opposing Mega's claim of breach of the Option Agreement is that the clauses requiring it to refund the Exclusivity and Option Payments are invalid. Accordingly, the Court finds that Mega has alleged that Aerco breached the Option Agreement.

### 3. Damages

 Finally, Mega successfully alleges that it has suffered damages resulting from Aerco's breach of the Option Agreement, namely Aerco's failure to return the Exclusivity and Option Payments that it was allegedly obliged to return. *See Total Petroleum P.R. Corp. v. Colón–Colón,* 819 F.Supp.2d 55, 69–70 (D.P.R.2011) (finding defendants breached their agreements with plaintiff by failing to pay the correct amounts for petroleum products and rent, causing damages to plaintiffs in the form of those unpaid sums). Plaintiff has allegedly suffered a loss of $2,000,000 as a result of defendant's failure to return the Exclusivity and Option Payments. Accordingly, the court finds that plaintiff has alleged a valid option contract, defendant's breach of said option contract, and resulting damages. Further, inasmuch as the return of the $2,000,000 Exclusivity and Option Payments requested by plaintiff is governed by the clauses discussed above, the Court finds they are valid as well.

As such, the Court **DENIES** defendant's motion for judgment on the pleadings **(ECF No. 32)** as to breach of the Option Agreement.

## V. Conclusion

In light of the foregoing, defendant's motion for judgment on the pleadings **(ECF No. 32)** is **DENIED.**

**SO ORDERED.**

---

on terms and conditions customary for transactions of that type; (d) the FCC License suffers a material decline in value at any time prior to July 31, 2010 or any third party makes a claim against said License that may reasonably be expected to result in an encumbrance being imposed on such License ...; (e) AERCO files a petition for bankruptcy or for reorganization or assigns the for the benefit of its creditors, or appointment of a receiver, trustee, liquidator or custodian for all or a substantial part of its property ...; or (f) The FCC Consent is not granted by the FCC for any reason attributable directly or indirectly to acts or omissions of AERCO.

